# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 1:21-cv-383-NCT-JEP

| | | |
|---|---|---|
| TIFFANY ADELE KING, | ) | |
| as Administratrix of the Estate of | ) | |
| Maurice Antoine King, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | |
| | ) | |
| CHARLES S. BLACKWOOD, in his | ) | |
| official capacity as Sheriff of Orange | ) | |
| County, ORANGE COUNTY, | ) | |
| TRAVELERS CASUALTY AND | ) | |
| SURETY COMPANY OF AMERICA, | ) | **AMENDED COMPLAINT** |
| WILLIAM D. BERRY, JR., in his | ) | (Jury Trial Demanded) |
| individual capacity, THOMAS E. | ) | |
| LINSTER, III, in his individual capacity, | ) | |
| WILMER A. GOMEZ, in his individual | ) | |
| capacity, STEFAN H. HOOKER, in his | ) | |
| individual capacity, KENDRICK R. | ) | |
| MOORE, in his individual capacity, | ) | |
| ANTONIO R. CARTNAIL, in his | ) | |
| individual capacity, ANGELA K. | ) | |
| SPEAR, in her individual capacity, | ) | |
| JERRY R. HAWKINS, in his individual | ) | |
| capacity, JAMISON R. SYKES, in his | ) | |
| individual capacity, | ) | |
| | ) | |
|     Defendants. | ) | |

1

NOW COMES Plaintiff, complaining of Defendants, and alleges and says as follows:

## INTRODUCTORY STATEMENT

1. On March 4, 2020, Maurice King, a thirty-four-year-old black man with a record of mental illness who was a federal prisoner at the Orange County Detention Center, was fatally assaulted in his cell by other prisoners in view of detention officers and their supervisors.

2. The assault on Mr. King resulted from the deliberate practice of not supervising prisoners in a Detention Center pod where prisoners known to be violent were housed together with non-violent, vulnerable prisoners such as Mr. King.

3. Mr. King's death from the assault resulted from emergency medical care not being provided.

4. Orange County intentionally delegated its responsibility for medical supervision of prisoners to the Sheriff and intentionally delegated its responsibility for arranging emergency medical care of prisoners to a contractor, Southern Health Partners, Inc.

5. Orange County Sheriff Blackwood's written policies showed awareness of the substantial risk of prisoner assaults on other prisoners and put the detention officers and their supervisors on notice of the substantial risk and

2

of the actions necessary to protect prisoners from other prisoners and to secure emergency medical care in the event of a prisoner assault.

6. In practice, however, the Sheriff's written policies were routinely disregarded by the Orange County Detention Center detention officers and their supervisors in the Detention Center and in the Sheriff's Office, and by the Sheriff himself.

7. As a result, on March 4, 2020, in view of the control room both through the glass wall and on the security camera monitors, Mr. King went from the B pod common area into his cell followed by another prisoner, who then closed the cell door behind them. Two other prisoners followed and also entered Mr. King's cell, visibly restrained someone in the doorway, and were then joined by another prisoner.

8. Detention officers took no action over the course of an hour and a half while the four prisoners who had entered Mr. King's cell, in view of the control room both through the glass wall and on the security camera monitors, took turns going into and out of Mr. King's cell, held the cell door closed, stood guard, and handed items between each other.

9. When detention officers entered the B pod during that hour and a half, they went through the motions of conducting rounds by touching their badges to electronic wall sensors without visually inspecting prisoners.

3

10. While going through the motions of conducting rounds during that hour and a half, detention officers walked past Mr. King's cell six times. They never looked into his cell.

11. Had they looked into Mr. King's cell as required, the detention officers would have seen that Mr. King was severely injured and was in need of emergency medical attention.

12. Neither the detention officers who entered the B pod nor anyone in the control room took any action when the prisoners who had entered Mr. King's cell visibly directed the officers away from Mr. King's cell.

13. An hour and nine minutes after the prisoners entered Mr. King's cell in view of the control room and on surveillance monitors, a detention officer going through the motions of a round heard a noise from Mr. King's cell which he considered suspicious. He chose to do nothing, but later reported what he had heard to another detention officer in the control room.

14. An hour and thirty-four minutes after the prisoners entered Mr. King's cell and twenty-five minutes after the suspicious noise, the other detention officer went to Mr. King's cell, where he found Mr. King lying down, minimally responsive, soaking wet, with visible swelling and bleeding from his left eye. Blood was visible on the walls and floor of the cell.

4

15. Despite Mr. King's serious condition, the detention officers declined to seek emergency medical attention.

16. Thirty-nine minutes after the detention officer found Mr. King in his cell, detention officers carried Mr. King out of his cell, shackled his legs, and with the assistance of one of the prisoners involved in the assault, carried him down the stairs, put him in a wheelchair and took him out of the B pod.

17. Two and a half hours after Mr. King was assaulted and nearly an hour after detention officers discovered him lying in his cell seriously injured, the jail nurse called 911 to request emergency medical services, reporting that Mr. King was having difficulty breathing, was not responding appropriately, and had a bruise over his eye.

18. EMS responded and transported Mr. King to Duke Hospital. Shortly after arriving at Duke Emergency Department, Mr. King went into cardiac arrest. Resuscitation efforts were unavailing. Mr. King was pronounced dead an hour and sixteen minutes after the 911 call.

19. The medical examiner concluded the assault caused Mr. King to suffer cardiac arrest from which he died and classified the death as a homicide.

20. Had the detention officers and their supervisors acted to protect Mr. King from the assault or to intervene during the assault, Mr. King would not have been severely injured.

5

21. Had the detention officers and their supervisors acted to secure medical attention for Mr. King's emergency medical needs, Mr. King would not have suffered the heart attack which caused his death, or, even if suffered, the heart attack could have been treated effectively so that it would not have been fatal.

22. Plaintiff brings this action under 42 U.S.C. § 1983 for deliberate indifference to Mr. King's safety from other prisoners and to his emergency medical needs in violation of the Eighth Amendment and under North Carolina law for wrongful death.

23. Plaintiff is suing Orange County and the Orange County Sheriff whose policy of deliberate indifference resulted in Mr. King's death and those in the Orange County Sheriff's Office and at the Orange County Detention Center who carried out the policy.

### JURISDICTION AND VENUE

24. Plaintiff as Administratrix of the Estate of Maurice Antoine King, brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived Mr. King of his Eighth Amendment right to be free from deliberate indifference to assaults by other prisoners and to be free from deliberate indifference to his serious medical needs.

6

25. This is also a wrongful death action under N.C.G.S. § 28A-18-2 to recover damages for Mr. King's wrongful death.

26. Plaintiff's action arises under the Constitution and laws of the United States and under the Constitution and laws of North Carolina.

27. The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

28. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29. Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Middle District of North Carolina because all of the events giving rise to this action occurred in the Middle District.

## PARTIES

### A. Plaintiff

30. Plaintiff Tiffany Adele King is a citizen and resident of Durham County, North Carolina.

31. Plaintiff is the Administratrix of the Estate of Maurice Antoine King. Plaintiff was duly appointed Administratrix by the Clerk of Superior Court in Durham County file no. 20-E-670.

32. Plaintiff is the mother of Maurice Antoine King ("Maurice King" or "Mr. King").

7

33. Maurice King, a black man, was born on April 24, 1985.  He was intellectually disabled.

34. Mr. King was thirty-four years old when he died on March 4, 2020.

35. Mr. King had three children.  They were fourteen, twelve and eight years old when Mr. King died.

36. According to the Orange County Detention Center's medical records, Mr. King suffered from post traumatic stress disorder, anxiety, depression and asthma and was prescribed propranolol, prazosin, mometasone and albuterol sulfate.

37. Mr. King had been found by psychologist Ginger Calloway in her report dated September 17, 2018 to lack the capacity to proceed to trial due to his intellectual disability, which report had been submitted to the Federal Court and filed under seal.

38. On August 29, 2019, the Federal Court accepted Mr. King's statement through appointed counsel that he was capable of proceeding to trial.

39. On February 4, 2020, through appointed counsel, the Federal Court accepted Mr. King's plea of guilty to three counts of distribution of cocaine. The Court continued sentencing to May 21, 2020.

40. On the date of his death, March 4, 2020, Mr. King was awaiting sentencing.

8

**B. Defendants Orange County, Sheriff Blackwood and Travelers Casualty and Surety Company of America**

41. Defendant Orange County is a North Carolina county organized and existing under N.C.G.S. § 153A-10.

42. Defendant Orange County has all of the corporate powers set forth in N.C.G.S. § 153A-11, including the power to be sued.

43. Defendant Orange County is a "unit" and "local government" under N.C.G.S. § 153A-216, *et seq.*

44. Defendant Orange County has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail, under N.C.G.S. § 153A-218.

45. Defendant Orange County maintains and operates the Orange County Detention Center, located at 125 Court Street, Hillsborough, NC 27278. The Detention Center consists of two floors and is designed to house up to 129 prisoners.

46. Defendant Orange County is responsible under N.C.G.S. § 153A-224 for ensuring the Detention Center custodial personnel provide continuous supervision to protect prisoners from assault by other prisoners.

47. Defendant Orange County is responsible under N.C.G.S. § 153A-225 for developing an adequate medical plan to provide medical care to prisoners at

9

the Orange County Detention Center, including the medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare. *See* Stockton v.Wake County, 173 F.Supp.3d 292, 303-04 (E.D.N.C. 2016).

48. Defendant Orange County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the safety of prisoners from assault by other prisoners and to the serious medical needs of prisoners, like Maurice King, who were victims of assault by other prisoners at the Orange County Detention Center.

49. Defendant Sheriff Charles S. Blackwood is a citizen and resident of Orange County, North Carolina.

50. Defendant Sheriff Blackwood is the duly elected Sheriff of Orange County.

51. Defendant Sheriff Blackwood is responsible for the care and custody of the prisoners of the Orange County Detention Center under N.C.G.S. § 162-22.

52. At all times relevant to this action, there existed an intergovernmental agreement between the United States Marshals Service and the Orange County Detention Center, signed by Defendant Sheriff Blackwood on September 28, 2016, in which Defendant Sheriff Blackwood had agreed for a per diem rate to "accept and provide for the secure custody, safekeeping, housing, subsistence and care of Federal detainees in accordance with all

10

state and local laws, standards, regulations, policies and court orders applicable to the operation of the Facility."

53. The intergovernmental agreement further obligated Defendant Sheriff Blackwood to provide medical care to federal prisoners in the Detention Center and required, "In the event of an emergency, the Local Government shall proceed immediately with necessary medical treatment."

54. Defendant Sheriff Blackwood had an affirmative nondelegable duty under N.C.G.S. § 153A-221 to comply with minimum standards to provide supervision of prisoners to protect their safety, security, health and welfare, and to provide medical care to prisoners at the Orange County Detention Center. *See* State v.Wilson, 183 N.C. App. 100, 104, 643 S.E.2d 620, 623 (2007).

55. Defendant Sheriff Blackwood is responsible for appointing, employing, training and supervising the deputies and detention officers at the Orange County Detention Center.

56. At the time of the events alleged herein, Defendant Sheriff Blackwood had appointed Major Jerry R. Hawkins, pursuant to N.C.G.S. § 162-22, to serve as the Chief Jailer and Keeper of the Orange County Detention Center.

57. Defendant Sheriff Blackwood is sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the safety of prisoners from assault by

other prisoners and to the serious medical needs of prisoners, like Maurice King, who were victims of assault by other prisoners at the Orange County Detention Center.

58. Defendant Sheriff Blackwood is sued in his official capacity.

59. Defendant Sheriff Blackwood has an official bond that was issued by Defendant Travelers Casualty and Surety Company of America in the amount of $25,000 as required by N.C.G.S. § 162-6.  This official bond was in effect at the time of the events alleged herein.

60. Defendant Sheriff Blackwood is sued under N.C.G.S. § 58-76-5 as the principal on the official bond.

61. Defendant Sheriff Blackwood has waived governmental immunity for Plaintiff's claim under N.C.G.S. § 58-76-5 to the extent of the bond.

62. Defendant Travelers Casualty and Surety Company of America is a Connecticut corporation that is duly licensed to conduct business in the state of North Carolina.

63. Defendant Travelers Casualty and Surety Company of America is sued as the surety on Defendant Sheriff Blackwood's official bond, pursuant to N.C.G.S. § 58-76-5.

12

## C. Individual Defendants

64. Defendant William D. Berry, Jr. is a citizen and resident of Orange County, North Carolina, and was, at all times relevant to this action, employed by the Orange County Sheriff's Office as a detention officer and was acting under color of state law.

65. On March 4, 2020, Defendant Berry was on duty and working as a detention officer at the Orange County Detention Center.

66. Defendant Berry is sued in his individual capacity.

67. Defendant Thomas E. Linster, III is a citizen and resident of Caswell County, North Carolina, and was, at all times relevant to this action, employed by the Orange County Sheriff's Office as a detention officer and was acting under color of state law.

68. On March 4, 2020, Defendant Linster was on duty and working as a detention officer at the Orange County Detention Center.

69. Defendant Linster is sued in his individual capacity.

70. Defendant Wilmer A. Gomez is a citizen and resident of Alamance County, North Carolina, and was, at all times relevant to this action, employed by the Orange County Sheriff's Office as a detention officer and was acting under color of state law.

13

71. On March 4, 2020, Defendant Gomez was on duty and working as a detention officer at the Orange County Detention Center.

72. Defendant Gomez is sued in his individual capacity.

73. Defendant Stefan H. Hooker is a citizen and resident of Orange County, North Carolina, and was, at all times relevant to this action, employed by the Orange County Sheriff's Office as a detention officer and was acting under color of state law.

74. On March 4, 2020, Defendant Hooker was on duty and working as a detention officer at the Orange County Detention Center.

75. Defendant Hooker is sued in his individual capacity.

76. Defendant Kendrick R. Moore is a citizen and resident of Alamance County, North Carolina, and was, at all times relevant to this action, employed by the Orange County Sheriff's Office as a deputy and supervisor with the rank of corporal and was acting under color of state law.

77. On March 4, 2020, Defendant Moore was on duty and working as the supervising corporal at the Orange County Detention Center.

78. Defendant Moore is sued in his individual capacity.

79. Defendant Antonio R. Cartnail is a citizen and resident of Orange County, North Carolina, and was, at all times relevant to this action, employed by the

14

Orange County Sheriff's Office as a deputy and supervisor with the rank of sergeant and was acting under color of state law.

80. On March 4, 2020, Defendant Cartnail was on duty and working as the supervising sergeant at the Orange County Detention Center.

81. Defendant Cartnail is sued in his individual capacity.

82. Defendant Angela K. Spear is a citizen and resident of Orange County, North Carolina, and was, at all times relevant to this action, employed by the Orange County Sheriff's Office as First Lieutenant to the Administrator of the Detention Center and was acting under color of state law.

83. As First Lieutenant to the Administrator of the Detention Center, Defendant Spear was responsible for implementing the Detention Center policies developed by Orange County and Defendant Sheriff Blackwood.

84. On March 4, 2020, Defendant Spear was on duty and working as the supervising lieutenant at the Orange County Detention Center.

85. Defendant Spear is sued in her individual capacity.

86. Defendant Jerry R. Hawkins is a citizen and resident of Orange County, North Carolina, and was, at all times relevant to this action employed by the Orange County Sheriff's Office as Administrator of the Orange County Detention Center and was acting under color of state law.

15

87. As Administrator of the Orange County Detention Center, Defendant Hawkins was responsible for implementing the Detention Center policies developed by Orange County and Defendant Sheriff Blackwood.

88. According to the Orange County Jail Policy and Procedure Manual, "The jail Administrator shall be responsible for insuring compliance and adherence to the policy and procedures manual by all Orange County Jail Detention personnel."

89. On March 4, 2020, Defendant Hawkins was on duty and working as the supervising administrator at the Orange County Detention Center.

90. Defendant Hawkins retired from his position as Administrator of the Orange County Detention Center on April 1, 2020.

91. Defendant Hawkins is sued in his individual capacity.

92. Defendant Jamison R. Sykes is a citizen and resident of Orange County, North Carolina, and was, at all times relevant to this action, Chief Deputy to Defendant Sheriff Blackwood and was acting under color of state law.

93. As Chief Deputy to Defendant Sheriff Blackwood, Defendant Sykes was responsible for ensuring Defendant Hawkins, who reported to Defendant Sykes, and the Detention Center staff were implementing the Detention Center policies developed by Orange County and Defendant Sheriff Blackwood.

16

94. Defendant Sykes is sued in his individual capacity.

<div align="center">**FACTUAL ALLEGATIONS**</div>

**A. Policy of deliberate indifference**

95. On March 4, 2020, Defendants Orange County and Sheriff Blackwood had a policy of deliberate indifference to the safety and medical needs of prisoners at the Orange County Detention Center.

96. This policy of deliberate indifference is clear from Defendants Orange County's and Sheriff Blackwood's disregard of the following:

    a. Non-compliance with minimum standards law requiring detention officers to provide continuous supervision of prisoners;

    b. Non-compliance with minimum standards law requiring detention officers to observe each prisoner when conducting rounds;

    c. Lack of protection of prisoners from assault by prisoners known to be violent;

    d. Lack of protection of prisoners known to be on the sex offender registry or charged with sex offenses;

    e. Failure to intervene during assaults of prisoners by other prisoners;

    f. Failure to address the emergency medical needs of prisoners who have been assaulted;

    g. Lack of response to prisoner reports of assaults by other prisoners;

<div align="center">17</div>

h. Failure to discipline prisoners who have assaulted other prisoners to discourage future assaults; and

i. Failure to protect victim prisoners and other prisoners after an assault had occurred from future assaults.

97. In violation of the minimum standards law requiring detention officers to provide continuous supervision of prisoners, Defendants routinely would:

a. Allow an unlimited number of prisoners to gather in the individual unmonitored cells, without any supervision; and

b. Allow prisoners to cover the small windows to the individual unmonitored cells so that detention officers could not see inside.

98. In violation of the minimum standards law requiring detention officers to conduct rounds on an irregular basis at least twice per hour during which they observe each prisoner, Defendants routinely would:

a. When conducting "rounds," not account for the individual prisoners in the common area;

b. When conducting "rounds," not look into the individual cells to check on the prisoners who were not in the common area; and

c. When conducting "rounds," touch their badges to the electronic wall sensors indicating they had observed each prisoner while knowing they had not.

18

99. Defendants further routinely declined to protect prisoners from assault by other prisoners by:

    a. Housing together the most violent prisoners with the most vulnerable prisoners while providing little to no supervision or protection;

    b. Allowing prisoners known to be violent to gather in the individual unmonitored cells with prisoners known to be vulnerable;

    c. Taking no action to protect prisoners known to be on the sex offender registry or charged with sex offenses despite knowing they were particularly likely to be assaulted by other prisoners;

    d. Declining to intervene while assaults were taking place, instead allowing the prisoners to govern themselves;

    e. Discouraging prisoners from filing complaints of assaults by other prisoners;

    f. Declining to make any record of assaults in the files of the prisoners who had assaulted other prisoners;

    g. Declining to discipline prisoners who had assaulted other prisoners;

    h. Declining to take any action to protect other prisoners from future assaults by known violent prisoners after an assault was committed;

i. Moving violent prisoners who had assaulted other prisoners to another jail location — such as the B pod — without implementing any increased level of security or supervision;

j. Intentionally omitting or misrepresenting on assaultive prisoners' booking reports the reasons for them being moved from one jail pod to another in order to cover up that an assault had been committed; and

k. Declining to take any action to protect reporting victim prisoners from assaults by other prisoners as retaliation for having reported the assault.

100. Defendants routinely declined to address the emergency medical needs of prisoners who had been assaulted by:

a. Declining to respond to prisoners immediately after an assault was committed;

b. When responding to prisoners after an assault was committed, declining to treat medical emergencies with urgency; and

c. After finding a prisoner seriously injured, declining to secure emergency medical care from a licensed physician.

20

101. Defendants routinely declined to supervise detention officers for compliance with minimum standards law requiring supervision of prisoners and provision of emergency medical care.

102. Defendants routinely declined to take disciplinary action against detention officers known to have violated minimum standards law requiring supervision of prisoners and provision of emergency medical care.

103. Defendants' lack of supervision and discipline for violations of minimum standards law created a widespread pattern and practice among Detention Center staff of deliberate indifference to the safety and medical needs of prisoners.

104. This pattern and practice of deliberate indifference to the safety and medical needs of prisoners was so widespread that it served as the unwritten policy of the Orange County Detention Center.

105. This pattern and practice of deliberate indifference, which was known to the prisoners, created an environment in which prisoners were not only permitted but were encouraged to supervise, discipline and otherwise govern each other, including by means of assaults for which they knew they would not be disciplined.

106. Defendants' pattern and practice of deliberate indifference to the safety of prisoners caused the assault of Maurice King on March 4, 2020.

21

107.   Defendants' pattern and practice of deliberate indifference to the emergency medical needs of prisoners caused the death of Maurice King on March 4, 2020.

**B. Safety and security of prisoners in the B Pod**

108.   After an assault was committed by a prisoner, Defendants routinely would either not respond at all or would move the violent prisoner to the B pod, where he would be in "lock back" for a few days, after which he would be released into the general population in the B pod, where, unlike in the other pods, he would have a private cell.

109.   The B pod, where Mr. King was being held on March 4, 2020, had a common area in view of the Detention Center control room, behind which were two floors of individual cells, with eleven cells on each floor.

110.   Stairs from the common area led to a walkway in front of the second-floor individual cells.  Mr. King's cell was the fourth individual cell from the right as seen from the control room.

111.   Detention Center security cameras were placed to view only the common area, stairs and walkway to the doors of the individual cells.  No cameras were placed inside the individual cells.

22

112. An intercom in each individual cell allowed detention officers in the control room to speak to prisoners in each individual cell and to listen to any sounds inside each cell.

113. The views recorded by the security cameras were displayed on monitors in the Detention Center control room so that Detention Center staff could observe what prisoners were doing in the common area and on the walkway both through the control room windows and on the control room monitors.

114. Because the Detention Center staff could not view the inside of the individual cells either through the control room windows or on the control room monitors, security of both the prisoners and of the Detention Center staff required allowing only the assigned prisoner to be in his individual cell.

115. Additionally, the doors to the individual cells in the B pod were opaque, with only a small window in each door.

116. Accordingly, for even minimal observation from the control room of the inside of the individual cells, whether directly through the control room windows or by viewing the control room monitors, security required the door windows not to be covered by any material.

117. Because of the opaque doors of the individual cells, security required any detention officer making rounds to look into each cell either by looking through the window or by opening the cell door.

23

118. Defendants' awareness of the security risks of assaults of prisoners by other prisoners is clear from their provision of an "Inmate Handbook" to each prisoner upon booking, including "blocking cell doors" and "fighting" as being among the behaviors which "will NOT be tolerated."

119. Defendants' awareness of the security risks raised by the individual cells with opaque doors is clear from the Orange County Jail Policy and Procedure Manual stating:

> In order to maintain the safety, control and security of the facility, staff, visitors and inmates, jail detention officers will be required to make supervision rounds of the facility at least twice per half hour and will be required to visually inspect inmates during these rounds … Under no circumstances shall any jail detention officer substitute electronic monitoring (e.g., television camera or intercom surveillance) for supervision rounds or direct visual observation of inmates.

120. Despite the Jail Policy and Procedure Manual mandating that detention officers make supervision rounds at least twice per half hour, detention officers routinely made supervision rounds only twice per hour.

121. Defendants' awareness of the security risks of assaults of prisoners by other prisoners is clear from the jail policy and procedure manual further stating: "When conducting supervision rounds, jail detention officers will observe inmates for signs of unusual or suspicious behavior."

24

122. Disregarding the security risk of assaults of prisoners by other prisoners, however, Defendants did not prohibit prisoners from congregating in the individual unmonitored cells of the B pod, regardless of a prisoner's history of mental illness, sex offender status or other vulnerabilities and regardless of a prisoner's history of violence.

123. Indeed, after the assault and death of Mr. King, Defendant Sykes confirmed to the media that it was not uncommon for prisoners to congregate in the individual cells, that there was no limit on how many prisoners could be inside an individual cell, and that there was no policy barring the prisoners from closing the doors to the cells.

124. Defendants routinely permitted prisoners to enter and remain in the individual cells assigned to other prisoners, outside the view of the control room and security cameras.

125. Defendants further permitted the prisoners to cover the windows in the opaque doors of their individual cells, preventing both the Detention Center staff in the control room and any detention officer conducting rounds from seeing through the window.

126. On March 4, 2020, the windows in the doors of the individual cells in the B pod, including the window in Mr. King's cell door, had towels covering all or portions of the windows.

25

127. Allowing prisoners to use the individual cells as common areas, gathering in unlimited numbers, with the cell doors closed, with no security cameras inside the individual cells and with items covering the windows to prevent detention officers from being able to see inside the cells, created obvious safety and security issues including an intolerable risk of harm to prisoners resulting from assaults by other prisoners.

**C. The fatal assault on Maurice King on March 4, 2020**

128. On March 4, 2020, Maurice King, who was being held in the B pod of the Orange County Detention Center, was assaulted in his cell by other prisoners as the result of Defendants declining to protect him before the assault and declining to intervene during the assault.

129. On March 4, 2020, the following were present and on duty at the Orange County Detention Center: Defendants Hawkins (jail administrator), Spear (supervising lieutenant), Cartnail (supervising sergeant), Moore (supervising corporal), Berry (detention officer), Linster (detention officer), Gomez (detention officer) and Hooker (detention officer).

130. Prisoners being held in the B pod on March 4, 2020 included:

    a. Tyler Lloyd Grantz, who was being held on a federal detainer and on a $1.5 million bond on state charges including attempted murder, assault on a law enforcement officer with a firearm, and going armed to the

26

terror of the people, and whose Orange County Sheriff's Office booking report stated: "Jail Alerts: Violent;"

b. Darryl Bradford, Jr., who was being held without bond in a federal capital murder case including charges of discharging a firearm causing death and carjacking, and whose Orange County Sheriff's Office booking report stated: "Jail Alerts: Gang Affiliation," "12/5/19 taken off razor restrictions per Major Hawkins," and "2/17/2020 moved from E cell to BPod lockback. Fight with inmate …;"

c. Linwood Earl Stephens, who was being held without bond awaiting sentencing on the federal charge of felon in possession of a firearm and whose Orange County Sheriff's Office booking report stated: "01/15/2020 put on lockback B Pod Room 117;"

d. Dawan Rashawn Salters, who was being held without bond awaiting sentencing on the federal charge of carrying and use by brandishing a firearm during and in relation to a crime of violence; and

e. Stephen McCrimmon, who was being held without bond for failing to appear on five state felony charges, including habitual misdemeanor assault as an habitual felon, and whose Orange County Sheriff's Office booking report stated: "Jail Alerts: Universal Precautions,

27

Violent," and: "Moved from 106 to B-Pod other inmates complaining he is making threats and using racial slurrs [sic]. 2/23/20."

131. Defendant Sheriff Blackwood's detention officers routinely would give Mr. McCrimmon extra supplies and even bring gifts into the Detention Center for Mr. McCrimmon in exchange for Mr. McCrimmon agreeing to "keep this pod running smooth."

132. Prior to the assault on Mr. King, Mr. McCrimmon committed an assault on another prisoner in the J pod who was being held on child sex offense charges. When the victim prisoner reported the assault and detention officers did not act to protect him, the victim prisoner's attorney moved the Court to order Defendant Sheriff Blackwood to transfer Mr. McCrimmon out of the J pod, which motion was granted.

133. Mr. McCrimmon was ultimately moved to the B pod, without any increase in supervision to protect the other B pod prisoners from assaults by Mr. McCrimmon. Defendants intentionally omitted from Mr. McCrimmon's booking sheet that he was moved to the B pod because he had committed an assault.

134. After Mr. McCrimmon was moved out of the J pod, the victim prisoner was again assaulted, this time by other prisoners in retaliation for having "snitched" and gotten Mr. McCrimmon moved.

28

135. Mr. McCrimmon is a frequent prisoner of the Orange County Detention Center, where he controls the other prisoners to the extent that other prisoners have to ask Mr. McCrimmon's permission before showering.

136. Defendants knew that prisoners — including Mr. McCrimmon — had specifically targeted and assaulted prisoners who were charged with sex offenses or who were on the sex offender registry.

137. It is apparent from the security recordings that Mr. McCrimmon was involved in the March 4, 2020 orchestrated attack on Mr. King.

138. Defendants knew from detention center records that Mr. King was on the sex offender registry.

139. Defendants also knew from detention center records that Mr. King had mental health issues, including present treatment for depression and anxiety, a history of hospitalizations for mental health problems, and diagnosis of schizophrenia or bipolar disorder, and that he had been found to have limited cognitive capacity.

140. On March 4, 2020, from view of the control room, as well as on display monitors inside the control room, the following events were apparent:

29

a. At 6:38[1] p.m., Mr. King was in the common area of the B pod speaking with prisoner Tyler Grantz in front of prisoners Stephen McCrimmon, Linwood Stephens and Darryl Bradford.

b. Thirty seconds later, Mr. King motioned for Mr. Grantz to follow him. He and Mr. Grantz then walked up the stairs to the second floor, where Mr. King's individual cell was located.

c. At 6:39 p.m., Mr. King and Mr. Grantz entered Mr. King's individual cell, and Mr. Grantz closed the door behind them.

d. Prisoner Dawan Salters, who was standing upstairs when Mr. King and Mr. Grantz walked past him, followed close behind them and then peered through the small uncovered portion of Mr. King's cell door window.

e. Mr. Stephens, who was downstairs in the common area sitting with Mr. McCrimmon and watching as Mr. King and Mr. Grantz walked upstairs and into Mr. King's cell, quickly walked upstairs as soon as Mr. Grantz closed Mr. King's cell door.

f. As Mr. Stephens approached the door to Mr. King's cell, Mr. McCrimmon said something to prisoner Darryl Bradford, Jr. and then

---

[1] Defendant Sheriff Blackwood has through counsel stated that the timestamps reflected on the Detention Center's security camera recordings are fifty-four minutes fast. The reason for this discrepancy is unknown. Times stated in this Complaint are alleged in real time, after adjusting the timestamps on the recordings by fifty-four minutes.

turned around to face Mr. King's cell and watched what was occurring upstairs.

g. Mr. Stephens then opened the door to Mr. King's cell. Mr. Stephens and Mr. Salters together then visibly restrained someone who was attempting to exit the cell, pushing him back into the cell.

h. As this was occurring, Mr. Bradford walked quickly upstairs, also entered Mr. King's cell, and closed the cell door behind him with himself, Mr. King, Mr. Grantz, Mr. Stephens and Mr. Salters all inside Mr. King's cell.

i. At 6:40 p.m., Mr. Bradford, Mr. Salters and Mr. Stephens exited Mr. King's cell, closing the door behind them with Mr. King and Mr. Grantz inside.

j. Mr. Stephens then leaned up against Mr. King's cell door with his foot holding the cell door shut while looking into the cell through the uncovered portion of the window and watching what was occurring inside, with Mr. Bradford and Mr. Salters standing beside him.

k. At 6:45 p.m., the prisoners opened the door to Mr. King's cell and allowed Mr. Grantz to exit. Mr. Grantz walked into his cell, which was also on the second floor, while wiping his face.

31

l. After Mr. Grantz exited Mr. King's cell, Mr. Bradford closed the door to Mr. King's cell, with Mr. King still inside.

m. While Mr. Bradford and Mr. Salters stood on the walkway in front of the second floor cells, Mr. Stephens entered Mr. Grantz's cell and spoke with Mr. Grantz.

n. Mr. McCrimmon walked upstairs and spoke with Mr. Stephens to the left of Mr. Grantz's cell. Mr. Stephens then re-entered Mr. Grantz's cell and spoke further with Mr. Grantz.

o. At 6:46 p.m., Mr. Bradford entered Mr. King's cell with Mr. Salters standing guard in the doorway to his own cell, three cells to the left of Mr. King's cell.

p. Mr. Stephens exited Mr. Grantz's cell and stood guard in the doorway to that cell, with Mr. Grantz still inside behind him.

q. At 6:47 p.m., Defendant Berry entered the B pod, and Mr. Stephens closed the door to Mr. Grantz's cell with Mr. Grantz inside.

r. When Defendant Berry entered the B pod, Mr. Salters entered Mr. King's cell where Mr. Bradford was. Mr. Bradford then immediately exited Mr. King's cell, closed Mr. King's cell door and entered the cell next to it.

32

s.  At 6:48 p.m., Mr. Stephens pointed Defendant Berry, who purportedly was conducting rounds, away from Mr. King's cell.  Defendant Berry then walked past Mr. King's cell without looking inside it.

t.  Mr. Bradford then re-entered Mr. King's cell.

u.  At 6:49 p.m., Defendant Berry again walked past Mr. King's cell without looking inside it, with Mr. Stephens talking to Defendant Berry.

v.  Mr. Stephens then led Defendant Berry downstairs where he handed Defendant Berry some books.

w.  At 6:50 p.m., Defendant Berry exited the B pod carrying the books.

x.  At 6:52 p.m., Mr. Bradford repeatedly opened and closed the door to Mr. King's cell.

y.  At 6:54 p.m., Mr. Bradford exited Mr. King's cell and handed something to Mr. Stephens which Mr. Stephens then threw onto the floor.  Mr. Bradford then re-entered Mr. King's cell.

z.  At 6:55 p.m., Mr. Bradford again began swinging the door to Mr. King's cell open and closed, with Mr. Stephens and Mr. Salters still standing guard.

aa.  At 6:58 p.m., Mr. Stephens opened the door to Mr. Grantz's cell, then stood in the doorway to the cell with Mr. Grantz behind him.

33

bb. At 6:59 p.m., Mr. Bradford again exited and re-entered Mr. King's cell, with Mr. Stephens going into and out of Mr. Grantz's cell and Mr. Salters continuing to stand guard.

cc. At 7:19 p.m., Defendant Linster entered the B pod and started walking upstairs, as Mr. Stephens closed the door to Mr. Grantz's cell.

dd. Defendant Linster then stood in front of Mr. King's cell door while speaking to Mr. Stephens, and then continued walking past Mr. King's cell, without looking into the cell.

ee. Defendant Linster touched his badge to the far wall sensor indicating he had conducted rounds, then walked back past Mr. King's cell, again without looking into the cell, this time while speaking with Mr. Bradford, who was walking in between Defendant Linster and Mr. King's cell.

ff. Defendant Linster then walked back downstairs and touched his badge to the downstairs wall sensors indicating he had conducted rounds.

gg. At 7:21 p.m., Defendant Linster exited the pod, without having looked into any cell.

hh. At 7:47 p.m., Defendant Linster re-entered the B pod, touched his badge to the two downstairs wall sensors, then walked upstairs.

34

ii. At 7:48 p.m., Defendant Linster walked past Mr. King's cell without looking into the cell, touched his badge to the far wall sensor indicating he had conducted rounds, and then walked back by Mr. King's cell, again without looking into the cell.

jj. After walking past Mr. King's cell, Defendant Linster looked back toward Mr. King's cell and spoke with Mr. Bradford, who was standing outside of Mr. King's cell. Defendant Linster then walked downstairs.

kk. At 7:49 p.m., Defendant Linster exited the B pod.

ll. At 7:51 p.m., Mr. Bradford began repeatedly re-entering and exiting Mr. King's cell.

mm. At 8:07 p.m., Mr. Bradford exited Mr. King's cell, picked something up off the floor, and walked downstairs to the common area.

141. The Defendants in the control room, directly and on the monitors, were able to see not only the conduct of the prisoners at and around Mr. King's cell, but also the conduct of Defendant Berry and Defendant Linster in conducting "rounds" without visually observing each prisoner, without looking into the cells, and without reacting to the conduct of Mr. Stephens,

35

Mr. Bradford, and Mr. Salters directing them away from Mr. King's and Mr. Grantz's cells.

**D.  Defendants' response to Mr. King's emergency medical needs**

142.  At 8:12 p.m., Defendant Berry entered the B pod carrying an inhaler and walked upstairs at a slow pace directly to Mr. King's cell, which he then entered.

143.  The Sheriff's Office later reported to the Department of Health and Human Services that Defendant Linster, while conducting rounds at approximately 7:50 p.m., had heard a prisoner making a concerning noise coming from Mr. King's cell as Defendant Linster was walking down the stairs.

144.  Instead of looking into Mr. King's cell, however, Defendant Linster exited the B pod.

145.  The Sheriff's Office reported to the Department of Health and Human Services that Defendant Linster told another detention officer in the control room that he thought he heard something coming from Mr. King's cell.

146.  At 8:13 p.m. — twenty-three minutes after Defendant Linster reportedly heard the sound coming from Mr. King's cell — Defendant Berry finally entered Mr. King's cell to find Mr. King lying down, minimally responsive, soaking wet, with visible swelling and bleeding from his left eye.

36

147. Visible blood was on the walls and floor of the cell.

148. At 8:17 p.m., knowing Mr. King was in need of emergency medical attention, Defendant Berry exited Mr. King's cell.

149. Defendant Berry walked toward the stairs, but then turned around, walked back past Mr. King's cell to the far wall, touched his badge to the wall sensor indicating he had conducted rounds, walked back past Mr. King's cell, touched his badge to the other upstairs wall sensor, walked down the stairs, touched his badge to both downstairs wall sensors, and then exited the B pod.

150. The Sheriff's Office reported to the Department of Health and Human Services that Defendant Berry "made a round and came back and said inmate King was having an asthma attack the [sic] he went to [sic] inmate's inhaler and a wheelchair to get inmate to the medical office."

151. According to Mr. King's Duke Hospital records, "patient was last seen normal at 7 pm and then found in his cell minimally responsive."

152. N.C.G.S. § 153A-224(b) explicitly requires:

> In a medical emergency, the custodial personnel shall secure emergency medical care from a licensed physician according to the unit's plan for medical care. If a physician designated in the plan is not available, the personnel shall secure medical services from any licensed physician who is available.

37

153. N.C.G.S. § 153A-225(a) explicitly requires: "Each unit that operates a local confinement facility shall develop a plan for providing medical care for prisoners in the facility. The plan: … (2) Shall provide for medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare …."

154. Orange County's medical plan for the Detention Center was silent regarding medical supervision of prisoners and securing emergency medical care when needed, providing only that its contractor, Southern Health Partners, Inc. ("SHP"), "shall arrange and/or provide emergency medical care, as medically necessary, to inmates through arrangements to be made by SHP."

155. Despite the fact Mr. King was experiencing an obvious medical emergency on March 4, 2020, Defendant Berry did not secure emergency medical care from a licensed physician.

156. At 8:26 p.m., Mr. Grantz came downstairs to the common area wearing shorts and a towel covering his head.

157. At 8:27 p.m., Defendant Berry and Defendant Linster, both wearing latex gloves, entered the B pod, walked upstairs and entered Mr. King's cell.

158. At 8:28 p.m., Defendant Gomez, also wearing latex gloves, entered the B pod, walked upstairs and entered Mr. King's cell.

38

159. Despite the fact Mr. King was experiencing an obvious medical emergency, Defendants Berry, Linster and Gomez did not secure emergency medical care from a licensed physician, in violation of N.C.G.S. § 153A-224(b).

160. At 8:30 p.m., Defendant Gomez exited Mr. King's cell and then exited the B pod.

161. At 8:37 p.m., Defendant Berry exited Mr. King's cell and then exited the B pod.

162. At 8:40 p.m., Defendant Gomez re-entered the B pod, walked upstairs and re-entered Mr. King's cell.

163. At 8:45 p.m., Defendant Berry re-entered the B pod again carrying something in his hand, walked upstairs and re-entered Mr. King's cell.

164. At 8:52 p.m., Defendants Berry and Linster exited Mr. King's cell with Mr. King draped over their shoulders. They held Mr. King up while Defendant Gomez shackled Mr. King's legs together.

165. With Mr. King draped over Defendants Berry's and Linster's shoulders and Defendant Gomez assisting from the front, Defendants slowly carried and walked Mr. King to the top of the stairs, with Mr. King struggling to move his feet.

39

166. At 8:55 p.m., Mr. Stephens, who within view of Defendants had participated in the assault of Mr. King, came upstairs. Employing the help of Mr. Stephens, Defendants Berry, Linster and Gomez finally carried Mr. King down the stairs.

167. At 8:56 p.m., Defendant detention officers placed Mr. King in a wheelchair and transported him to the nurse's office.

168. At 9:06 p.m. — two and a half hours after Mr. King was assaulted and nearly an hour after Defendant detention officers discovered him lying in his cell seriously injured and unable to walk — the jail nurse called 911 to request emergency medical services, reporting that Mr. King was having difficulty breathing, was not responding appropriately, and had a bruise over his eye.

169. At 9:13 p.m., when emergency medical personnel arrived, Mr. King was in a wheelchair and was sluggish to answer questions, but "was breathing adequately and without difficulty."

170. Defendants told emergency medical personnel "there was no evidence in [Mr. King's] cell that he had fallen and that [Mr. King] was found in his bed."

171. Defendants wrongly reported to emergency medical personnel having last seen Mr. King "normal around 1900 as he went to take a shower."

40

172. Emergency medical personnel noted that Mr. King was soaking wet and had a hematoma over his left eye with swelling and bruising to both the upper and lower eyelids and visible blood on the eye itself. Mr. King was complaining of chest pain.

173. At 9:31 p.m., emergency medical personnel transported Mr. King from the Detention Center to Duke Emergency Department. In the ambulance on the way to the hospital, Mr. King told medical personnel that "Grant" had "stomped him in the head" and "choked him out."

174. While en route to Duke Emergency Department, emergency medical personnel consulted cardiology and performed EKGs on Mr. King. Mr. King became acutely extremely hypertensive, was noted to have diminished strength on the left side of his body, and complained that he could not use his left arm and felt like he could not breathe.

175. When he arrived at Duke Emergency Department at 9:42 p.m., Mr. King was having a major heart attack. Hospital staff noted "obvious trauma to head (contusion/ bruising to left eye)" and "a very high concern for TBI[2] (especially IC[3] bleed)."

176. At 10:04 p.m., Duke Emergency medical staff were attempting to intubate Mr. King, but he was vomiting.

---

[2] TBI stands for traumatic brain injury.
[3] IC stands for intracranial.

41

177. Shortly after arriving at Duke Emergency Department, Mr. King went into cardiac arrest. After several rounds of chest compressions, resuscitation efforts were ceased. Mr. King was pronounced dead at 10:22 p.m.

178. As a result of the assault which Defendants declined to prevent or stop and as a result of Defendants not seeking emergency medical treatment, medical personnel were unable to save Mr. King's life.

**E. Investigations and findings by medical examiners**

179. Local medical examiner Matthew Crittenden made contact with Defendants, who claimed an altercation had occurred but could not be seen on video due to it having occurred in a cell. Mr. Crittenden made multiple requests of Defendants to view the video and reports but Defendants would not provide the requested documentation.

180. Mr. Crittenden produced a report and referred the case to the Office of the Chief Medical Examiner.

181. In his report titled "Medical Examiner Preliminary Summary of Circumstances Surrounding Death," Mr. Crittenden stated: "I believe death occurred in this case due to acute cardiac arrhythmia secondary to blunt force trauma. I believe the manner of death for this case should be homicide."

42

182. Medical examiner Dr. Kimberly Janssen of the Office of the Chief Medical Examiner performed the autopsy on March 5, 2020 with Orange County Sheriff's Office Detective Hendricks present.

183. Dr. Janssen found swelling and deep scalp hemorrhage of Mr. King's right forehead; laceration, contusion and swelling of the right side of Mr. King's face; swelling, abrasion, and petechial hemorrhage of Mr. King's left eyelid; and hemorrhage of Mr. King's left eye.

184. Dr. Janssen noted in the autopsy report that she did not view the surveillance video herself but instead relied on a timeline of events provided by the Orange County Sheriff's Office.

185. Defendants misrepresented the following to the medical examiner:

    a.  that this was a physical altercation between Mr. King and one other prisoner;

    b.  that other prisoners had gone into Mr. King's cell after the assault "to check on Mr. King multiple times;"

    c.  the time of the assault;

    d.  the length of time Defendants delayed responding after the assault and after hearing Mr. King "making sounds" in his cell; and

    e.  Mr. King's physical and mental condition when Defendants found him.

43

186. In the autopsy report, Dr. Janssen classified the cause of death as hypertensive cardiovascular disease in the setting of a physical altercation.

187. Dr. Janssen classified the manner of death as homicide.

**F. Investigation by the North Carolina Department of Health and Human Services**

188. Mr. King's death prompted an investigation of the Orange County Detention Center and its staff by the North Carolina Department of Health and Human Services.

189. N.C.G.S. § 153A-224(a) explicitly requires:

> No person may be confined in a local confinement facility unless custodial personnel are present and available to provide continuous supervision in order that custody will be secure and that, in event of emergency, such as fire, illness, assaults by other prisoners, or otherwise, the prisoners can be protected. These personnel shall supervise prisoners closely enough to maintain safe custody and control and to be at all times informed of the prisoners' general health and emergency medical needs.

190. The North Carolina Administrative Code, at 10A NCAC 14J.0601(a), requires:

> A jail shall have an officer make supervision rounds and observe each inmate at least two times within a 60 minute time period on an irregular basis with not more than 40 minutes between rounds. Supervision rounds shall be conducted 24 hours a day, 7 days per week … The supplemental methods of supervision specified in

44

Paragraph (b) of this Rule shall not substitute for supervision rounds.

191. The North Carolina Administrative Code, at 10A NCAC 14J.0601(b), requires:

A jail shall utilize one or more supplemental methods of supervision 24 hours a day, 7 days a week. The supplemental methods of supervision are: (1) direct two-way voice communication; (2) remote two-way voice communication; (3) direct visual observation; and (4) video surveillance.

192. Chief Jail Inspector Chris Wood of the North Carolina Department of Health and Human Services found: "Based on records review, staff interview, and observation of a video recording …, the facility did not make supervision rounds as required by Rule."

193. Specifically regarding "[o]bservation of a video recording of [redacted] on March 4, 2020 from 5:00 pm through 12:00 am on March 5, 2020," the Chief Jail Inspector found "the recording reflects officers making rounds but not looking into the cell."

194. Regarding "[r]eview of a timeline record provided by the [Detention Center] administration," the Chief Jail Inspector found that for March 4 to March 5, 2020, "Rounds conducted during the 6:00 pm, 7:00 pm, 8:00 pm, 9:00 pm, 10:00 pm, 11:00 pm, and the 12:00 am hours were listed as Non-Quality Rounds."

45

195. Based on interviews of Detention Center staff, the Chief Jail Inspector found "[a] non-quality round was identified as a round in which the officer did not look into the cell when making supervision rounds."

196. As noted by the Chief Jail Inspector, even after Mr. King was finally found injured and in distress and transported to Duke Emergency Department where he died, Defendants continued to disregard the law by continuing to conduct their mandated rounds without looking into the individual cells.

197. In the recordings reviewed, no quality rounds were found.

198. In the recordings of B pod, Defendants Berry, Linster, and Gomez — in view of the detention officers and supervisors in the control room — can be seen walking directly to each of four sensors on the pod walls and touching the sensor to indicate performance of a round, without looking into any cell to account for prisoners not in the common area and without reacting to suspicious behavior by the prisoners in the common area.

199. Defendant Sheriff Blackwood's response to the official notice of violations of the State's minimum standards law was to commit to "additional training [which] clarifies and emphasizes the requirement of … direct observation of inmates during supervision rounds."

46

200. Defendant Sheriff Blackwood represented in his response to the Department of Health and Human Services: "Disciplinary action will be taken against the detention officers observed during the May 4, 2020 [sic] incident for failure to comply with the direct observation requirement for supervision rounds."

201. However, despite having violated minimum standards law resulting in Mr. King's assault and death, none of the detention officers or supervisors involved and responsible were dismissed, demoted, suspended or transferred.

**FIRST CLAIM FOR RELIEF:**
**DELIBERATE INDIFFERENCE TO MR. KING'S SAFETY FROM ASSAULT BY OTHER PRISONERS AND TO HIS SERIOUS MEDICAL NEEDS IN VIOLATION OF THE EIGHTH AMENDMENT BY DEFENDANTS BERRY, LINSTER, GOMEZ, HOOKER, MOORE, CARTNAIL, SPEAR AND HAWKINS**

202. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

203. Mr. King had the clearly established right guaranteed by the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment, including deliberate indifference to his safety from assault by other prisoners and deliberate indifference to his serious medical needs. *See* Farmer v. Brennan, 511 U.S. 825 (1994); Scinto v. Stansberry, 841 F.3d 219 (4th Cir. 2016).

47

204. On March 4, 2020, Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear and Hawkins each were well aware of the excessive risk of assault on prisoners by other prisoners in the B pod creating the need for emergency medical care, because of the Orange County Jail Policy and Procedure Manual, the Inmate Handbook, the layout of the B pod, and the known history of violence of the prisoners then housed in the B pod, including a history of assaulting prisoners believed to be sex offenders.

205. Additionally, Defendants were aware of the documented mental health history of Maurice King, and that Mr. King was on the sex offender registry, making him particularly vulnerable to assault by other prisoners in the B pod.

206. Despite their awareness of the excessive risk of assault on prisoners by other prisoners in the B pod and Mr. King's particular vulnerability, Defendants intentionally declined to take reasonable steps to protect Mr. King from the known substantial risk of serious harm from assault by the other prisoners in the B pod.

207. Defendants demonstrated their deliberate indifference to Mr. King's safety from assault by other prisoners and to his serious medical needs on March 4, 2020 by:

48

a. Allowing Mr. Grantz to follow Mr. King into Mr. King's cell and close the door;

b. Allowing Mr. Stephens and Mr. Salters to follow Mr. Grantz and Mr. King into Mr. King's cell;

c. Declining to intervene when Mr. Stephens and Mr. Salters visibly restrained someone in the doorway to Mr. King's cell;

d. Allowing Mr. Bradford to enter Mr. King's cell after Mr. Stephens and Mr. Salters visibly restrained someone in the doorway, leaving Mr. King, Mr. Grantz, Mr. Stephens, Mr. Salters and Mr. Bradford in Mr. King's cell together;

e. Declining to intervene when Mr. Stephens was visibly holding the door to Mr. King's cell closed with Mr. King and Mr. Grantz inside the cell;

f. Declining to intervene when Mr. Salters and Mr. Bradford were visibly guarding Mr. King's cell with Mr. King and Mr. Grantz inside the cell;

g. Declining to intervene when Mr. Grantz exited Mr. King's cell wiping his face, leaving Mr. King inside, with Mr. Bradford then closing the door to Mr. King's cell;

49

h. Declining to intervene when Mr. Bradford continuously entered and exited Mr. King's cell while the other prisoners stood guard outside of Mr. King's cell;

i. Repeatedly declining to look into Mr. King's cell to check on him when conducting "rounds," and declining to respond to this repeated misconduct of the detention officers;

j. Declining to respond when Mr. Stephens twice directed Defendant Berry away from Mr. King's cell when Defendant Berry was conducting "rounds;"

k. Delaying an hour and a half after the assault on Mr. King before checking on Mr. King in his cell;

l. Delaying twenty-three minutes to check on Mr. King after Defendant Linster reportedly heard a concerning noise coming from Mr. King's cell;

m. Delaying forty-three minutes after finding Mr. King in his cell, visibly injured, minimally responsive and unable to walk, before bringing Mr. King to the nurse;

n. Delaying fifty-five minutes after finding Mr. King in his cell, visibly injured, minimally responsive and unable to walk, before the call was finally made to request emergency medical care; and

<div align="center">50</div>

o. Deliberately providing false information to emergency medical personnel.

208. Defendants Berry, Linster, and Gomez demonstrated their deliberate indifference to Mr. King's safety from assault by other prisoners and to his serious medical needs by their actions and by intentionally declining to take action in the B pod on March 4, 2020.

209. Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear and Hawkins, who were on duty on March 4, 2020, demonstrated their deliberate indifference to Mr. King's safety from assault by other prisoners and to his serious medical needs by intentionally declining to take action from the control room.

210. Defendants Moore, Cartnail, Spear, and Hawkins, who had supervisory responsibility over the detention officers in the B pod, had actual or constructive knowledge that their subordinates were declining to act to protect Mr. King from assault, to intervene during the assault, and to secure emergency medical care after the assault and tacitly authorized their subordinates' conduct by intentionally declining to take any supervisory action.

211. Defendants continued to demonstrate their deliberate indifference to the safety of prisoners by declining to observe prisoners when conducting

51

"rounds" and declining to respond to this continued misconduct of the detention officers *even after* Mr. King was found seriously injured and transported to Duke Emergency Department.

212. Defendants' deliberate indifference to the substantial risk of serious harm to Mr. King allowed the known violent prisoners to assault Mr. King on March 4, 2020, causing Mr. King's death.

213. The fatal assault on Mr. King was a clearly foreseeable result of Defendants' deliberate indifference to the substantial risk of serious harm to Mr. King.

214. Defendants' deliberate indifference to the substantial risk of serious harm to Mr. King and to Mr. King's medical needs severely delayed medical care for Mr. King's injuries from the assault on March 4, 2020, causing Mr. King's death.

215. Defendants at all times alleged herein were acting under color of state law.

216. Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for their deliberate indifference to Mr. King's safety from assault by other prisoners and to Mr. King's serious medical needs which caused Mr. King's assault and death in violation of Mr. King's right to be free from cruel and unusual

52

punishment guaranteed by the Eighth Amendment to the United States

Constitution.

**SECOND CLAIM FOR RELIEF:**
**POLICY OR CUSTOM OF DELIBERATE INDIFFERENCE TO THE SAFETY OF PRISONERS FROM ASSAULT AND TO THE SERIOUS MEDICAL NEEDS OF PRISONERS BY DEFENDANTS ORANGE COUNTY, SHERIFF BLACKWOOD, SYKES, HAWKINS, SPEAR, CARTNAIL, MOORE, BERRY, LINSTER, GOMEZ AND HOOKER**

217.  The allegations set forth in the preceding paragraphs are incorporated herein by reference.

218.  Municipal liability results "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. Department of Social Services Of New York, 436 U.S. 658, 694 (1978).

219.  At all times relevant to this action, Defendant Orange County had final policymaking authority over the provision of medical care and emergency medical care to prisoners at the Orange County Detention Center. *See* Vaught v. Ingram, No. 5:10-CT-3009 (E.D.N.C., Feb. 24, 2011).

220.  At all times relevant to this action, Defendant Orange County was responsible for ensuring the Detention Center custodial personnel provided continuous supervision of prisoners and emergency medical care for prisoners at the Orange County Detention Center.

53

221. At all times relevant to this action, Defendant Sheriff Blackwood was the duly elected Sheriff of Orange County and as such was responsible for ensuring the Detention Center custodial personnel provided continuous supervision of prisoners and emergency medical care for prisoners at the Orange County Detention Center.

222. At all times relevant to this action, Defendant Sheriff Blackwood had final policymaking authority regarding the safety and protection of prisoners and the provision of medical care and emergency medical care to prisoners at the Orange County Detention Center.

223. Municipal liability applies where there is "irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example." Spell v. McDaniel, 824 F.2d 1380, 1389 (4th Cir. 1987).

224. The Orange County Detention Center had a longstanding and widespread pattern of unconstitutional conduct by its deputies and detention officers of which Defendants' violations of Maurice King's constitutional rights are simply examples.

225. Defendants demonstrated deliberate indifference to Mr. King's safety from assault by other prisoners before, during and after March 4, 2020 by:

54

a. Housing together the most violent prisoners with the most vulnerable prisoners with little to no supervision or protection;

b. Allowing prisoners to enter each other's individual cells and close the doors where they could not be viewed, supervised or protected;

c. Allowing prisoners to cover the windows to their individual cells;

d. Declining to discipline prisoners for committing assaults on other prisoners to protect prisoners from future assaults;

e. Declining to supervise prisoners known to have committed assaults on other prisoners to protect prisoners from future assaults;

f. Discouraging prisoners from "snitching" by reporting assaults committed against them by other prisoners;

g. When assaults between prisoners were reported, declining to act to protect prisoners from future assaults;

h. When assaults between prisoners were reported or otherwise discovered, declining to address the emergency medical needs of prisoners who had been assaulted;

i. Allowing and encouraging the prisoners to supervise and discipline each other;

j. Giving prisoners gifts in exchange for prisoners agreeing to "keep this pod running smooth;"

k. Non-compliance with state minimum standards law requiring detention officers to visually check on prisoners at least twice per hour to ensure their safety and wellbeing; and

l. Having a pattern and practice known to the prisoners of conducting "rounds" without actually observing the prisoners as required by minimum standards law.

226. Defendants Orange County and Sheriff Blackwood declined to put a stop to or to correct these widespread patterns of unconstitutional conduct by the Orange County Detention Center detention officers and supervisors.

227. Defendant Orange County's medical plan for the Orange County Detention Center provided only for medical care to be provided to prisoners by Southern Health Partners, Inc., leaving Defendant Sheriff Blackwood as the chief policymaker for Orange County regarding the supervision of prisoners to determine their emergency medical needs.

228. Defendant Sheriff Blackwood's response to the official notice of violations of the State's minimum standards law in which he merely committed to "additional training [which] clarifies and emphasizes the requirement of … direct observation of inmates during supervision rounds" is an acknowledgement by Defendant Sheriff Blackwood that he knew of the

widespread pattern of noncompliance with the statutory mandate of direct observation of prisoners.

229. Defendant Sheriff Blackwood's decision not to meaningfully discipline any detention officer or supervisor for the multiple March 4, 2020 violations of minimum standards law which caused the fatal assault of Mr. King demonstrates that Defendant Sheriff Blackwood knew this unconstitutional conduct of deliberate indifference was a widespread pattern.

230. At all times relevant to this action, Defendants acted in a law enforcement environment created by Defendants Orange County and Sheriff Blackwood which tacitly authorized detention officers and supervisors to violate minimum standards law and the constitutional rights of prisoners, causing this misconduct to become the unwritten policy of Defendants Orange County and Sheriff Blackwood at the Orange County Detention Center.

231. The conduct of Defendants on March 4, 2020 which caused the assault of Maurice King and Mr. King's death from the injuries suffered and the delay in providing emergency medical care was in keeping with the unwritten policy of Defendants Orange County and Sheriff Blackwood at the Orange County Detention Center.

232. The unwritten policy of Defendants Orange County and Sheriff Blackwood demonstrated a deliberate indifference to the safety and medical needs of prisoners and created a substantial risk of harm to prisoners housed at the Orange County Detention Center.

233. Defendants Sykes, Hawkins, Spear, Cartnail, Moore, Berry, Linster, Gomez and Hooker through their actions and through declining to act implemented the unwritten policy of Defendants Orange County and Sheriff Blackwood at the Orange County Detention Center.

234. Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for their pattern and practice of deliberate indifference to the safety and medical needs of prisoners which caused Mr. King's assault and death in violation of Mr. King's right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

**THIRD CLAIM FOR RELIEF:**
**WRONGFUL DEATH BY WILLFUL OR WANTON CONDUCT BY DEFENDANTS BERRY, LINSTER, GOMEZ, HOOKER, MOORE, CARTNAIL, SPEAR AND HAWKINS RESULTING IN THE DEATH OF MAURICE KING**

235. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

236. Before March 4, 2020, Defendants consciously and intentionally disregarded and were indifferent to the rights and safety of prisoners which

58

Defendants knew or should have known were reasonably likely to result in injury from assaults by other prisoners by:

 a. Housing together the most violent prisoners with the most vulnerable prisoners while providing little to no supervision;

 b. Declining to establish a rule prohibiting prisoners from congregating in the individual unmonitored cells;

 c. Allowing prisoners to congregate together in the individual unmonitored cells, with the doors closed;

 d. Allowing prisoners to cover the windows to their individual cells;

 e. Declining to conduct rounds observing each prisoner in the B pod;

 f. Declining to enforce the minimum standards law requiring observation of each prisoner when conducting rounds;

 g. Discouraging prisoners from reporting assaults committed against them by other prisoners;

 h. Declining to discipline prisoners for committing assaults on other prisoners or otherwise to protect prisoners from future assaults; and

 i. Allowing and encouraging prisoners to supervise and discipline each other.

237. On March 4, 2020, Defendants consciously and intentionally disregarded and were indifferent to the rights and safety of Mr. King which Defendants

59

knew or should have known were reasonably likely to result in injury from assault by other prisoners by:

    a.  Declining to intervene when Mr. King and Mr. Grantz entered Mr. King's cell, with Mr. Grantz closing the cell door behind him;

    b.  Declining to intervene when Mr. Stephens and Mr. Salters followed and restrained someone in Mr. King's cell;

    c.  Declining to intervene when Mr. Bradford entered Mr. King's cell with Mr. Grantz, Mr. Stephens, and Mr. Salter already inside;

    d.  Declining to intervene when Mr. Stephens held the door to Mr. King's cell closed while Mr. Bradford and Mr. Salters stood guard;

    e.  Declining to intervene when Mr. Grantz exited Mr. King's cell, wiping his face, leaving Mr. King inside, with Mr. Bradford then closing the door to Mr. King's cell; and

    f.  Declining to intervene when Mr. Bradford repeatedly entered and exited Mr. King's cell while Mr. Stephens and Mr. Salters stood guard.

238.  On March 4, 2020, Defendants consciously and intentionally disregarded and were indifferent to the rights and safety of Mr. King which Defendants knew or should have known were reasonably likely to result in death from Defendants' delay of emergency medical services by:

60

a. Declining to enter Mr. King's cell following the conduct of Mr. Grantz, Mr. Stephens, Mr. Bradford and Mr. Salters which was in full view of the control room;

b. Declining to enter Mr. King's cell immediately after Defendant Linster heard a concerning noise coming from Mr. King's cell;

c. Declining to seek emergency medical care immediately upon finding Mr. King in his cell, seriously injured, minimally responsive and unable to walk; and

d. Misrepresenting to emergency medical personnel their knowledge of what had occurred.

239. Defendants' conscious and intentional disregard and indifference to the rights and safety of Mr. King from assault by other prisoners and to Mr. King's serious medical needs were the proximate cause of Mr. King's death.

240. Defendants are liable to Plaintiff pursuant to N.C.G.S. § 28A-18-2 for their willful or wanton conduct including their conscious and intentional disregard and indifference to the rights and safety of Mr. King which caused Mr. King's assault and death.

**FOURTH CLAIM:**
**ACTION ON OFFICIAL BOND AGAINST DEFENDANTS SHERIFF BLACKWOOD AND TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA**

241. The allegations of the preceding paragraphs are incorporated herein by

61

reference.

242. On September 2, 2018, Defendant Sheriff Blackwood procured an official bond as principal from Travelers Casualty and Surety Company of America in the sum of $25,000.

243. Defendant Sheriff Blackwood's official bond was in full force and effect on March 4, 2020 and through the present.

244. Defendant Orange County deputies and detention officers were acting within the course and scope of their employment and under color of the Orange County Sheriff's Office when they declined to protect Maurice King from assault and then declined to timely or appropriately respond to his medical needs, causing his death.

245. The acts of Defendant deputies and detention officers, as alleged in this action and imputed to Defendant Sheriff Blackwood, constitute misconduct, misbehavior, and a breach of their official duties.

246. The customs and practices of Defendant Sheriff Blackwood as alleged in this action constitute misconduct, misbehavior, and a breach of his official duties as sheriff.

247. Defendant Sheriff Blackwood and Travelers Casualty and Surety Company of America are liable to Plaintiff, pursuant to N.C.G.S. § 58-76-5, for the unlawful acts committed by Defendant Sheriff Blackwood and

62

Defendant deputies and detention officers under color of the Orange County Sheriff's Office.

## DAMAGES

248. As the direct and proximate result of the wrongful acts of Defendants, as alleged herein, Maurice King was fatally assaulted by other prisoners at the Orange County Detention Center.

249. As the direct and proximate result of Defendants' violations of the rights of Maurice King, Mr. King suffered physical and emotional pain and suffering; the loss of his life; loss of future wages; and such other damages as may be shown by the evidence.

250. As the direct and proximate result of Defendants' actions, Plaintiff. as Administratrix of the Estate of Maurice Antoine King, has suffered funeral and burial expenses and the costs of this action.

251. Plaintiff, as Administratrix of the Estate of Maurice Antoine King, is entitled to recover compensatory damages from Defendants, jointly and severally, for the claims of Maurice King under 42 U.S.C. § 1983.

252. Plaintiff, as Administratrix of the Estate of Maurice Antoine King, is entitled to recover punitive damages from Defendants, individually, for the claims of Maurice King under 42 U.S.C. § 1983.

253. Plaintiff, as Administratrix of the Estate of Maurice Antoine King, is entitled to recover compensatory damages from Defendants, jointly and severally, for the state law claims of Maurice King.

254. Plaintiff, as Administratrix of the Estate of Maurice Antoine King, is entitled to recover punitive damages from Defendants, individually, for the state law claims of Maurice King.

255. Plaintiff is entitled to recover damages from Defendants Sheriff Blackwood and Travelers Casualty & Surety Company of America, jointly and severally, to the extent of the Sheriff's official bond for Plaintiff's claim under N.C.G.S. § 58-76-5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for the following relief:

1. Compensatory damages from Defendants, jointly and severally;

2. Punitive damages from Defendants in their individual capacities;

3. Reasonable attorney's fees and litigation expenses under 42 U.S.C. § 1988 and under N.C.G.S. § 1D-45.

4. Costs of court and interest as allowed by law;

5. A trial by jury on all contested issues of fact; and

6. Such other and further relief as the Court may deem just and proper.

64

This the 23rd day of August, 2021.

<div style="margin-left:45%">

/s/ L. Allyn Sharp
L. Allyn Sharp
Allyn Sharp Law, PLLC
P.O. Box 730
Carrboro, NC 27510
Telephone: (919) 265-9200
Facsimile: (919) 869-1874
allynsharplaw@gmail.com
N.C. State Bar No. 43195
Counsel for Plaintiff

</div>

65

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document entitled, **Amended**

**Complaint**, was filed electronically with the Clerk of Court using the CM/ECF

system, which will send notification of the filing to the following persons:


Brian F. Castro
Womble Bond Dickinson (US) LLP
brian.castro@wbd-us.com
*Attorney for Defendants*

James R. Morgan, Jr.
Womble Bond Dickinson (US) LLP
Jim.Morgan@wbd-us.com
*Attorney for Defendants*


This the 23rd day of August, 2021.

<div align="right">

/s/ L. Allyn Sharp
L. Allyn Sharp
Allyn Sharp Law, PLLC
P.O. Box 730
Carrboro, NC 27510
Telephone: (919) 265-9200
Facsimile: (919) 869-1874
allynsharplaw@gmail.com
N.C. State Bar No. 43195
Counsel for Plaintiff

</div>