IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TIFFANY ADELE KING,                        )
as Administratrix of the Estate of          )
Maurice Antoine King,                       )
                                            )
            Plaintiff,                       )
                                            )
      v.                                    )            1:21CV383
                                            )
CHARLES S. BLACKWOOD, in his               )
official capacity as Sheriff of Orange      )
County, ORANGE COUNTY,                      )
TRAVELERS CASUALTY AND                     )
SURETY COMPANY OF AMERICA,                  )
Official bond for Defendant Sheriff Blackwood )
WILLIAM D. BERRY, JR., in his              )
individual capacity, THOMAS E.              )
LINSTER, III, in his individual capacity,    )
WILMER A. GOMEZ, in his individual          )
capacity, STEFAN H. HOOKER, in his         )
individual capacity, KENDRICK R.            )
MOORE, in his individual capacity,          )
ANTONIO R. CARTNAIL, in his                )
individual capacity, ANGELA K.              )
SPEAR, in her individual capacity,          )
JERRY R. HAWKINS, in his individual         )
capacity, and JAMISON R. SYKES, in         )
his individual capacity,                     )
                                            )
            Defendants.                      )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

This is a civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Tiffany Adele King,

as Administratrix of the Estate of Maurice Antoine King. Mr. King died on March 4, 2020,

after an assault by other prisoners at the Orange County Detention Center (OCDC) while he

was held there awaiting sentencing on federal charges. In this suit, Plaintiff brings claims

against Orange County, Sheriff Blackwood, and several OCDC detention officers and supervisors based on the allegations that they allowed Mr. King to be beaten by other inmates and failed to attend to his condition quickly enough to prevent his death. Pending before the Court are three Motions to Dismiss [Doc. #33, #35, #37] filed by Defendants who move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the case for failure to state a claim upon which relief can be granted.

I.    FACTUAL ALLEGATIONS AND CLAIMS

Because this matter is before the Court on motions to dismiss, the Court sets out here the facts as alleged by Plaintiff in the Amended Complaint [Doc. #30].

Plaintiff alleges that on March 4, 2020, King was being held in the B pod at the OCDC and was assaulted in his cell by other prisoners who were known to be violent. Plaintiff alleges that the following Defendants were on duty at the OCDC at the time: Defendants Berry, Linster, Gomez, and Hooker, as detention officers; Defendant Moore, as the supervising corporal; Defendant Cartnail, as the supervising sergeant; Defendant Spear, as the supervising lieutenant; and Defendant Hawkins, as the supervising administrator. (Am. Compl. ¶¶ 65, 68, 71, 74, 77, 80, 84, 89.)

Plaintiff alleges that Defendants knew that King was a vulnerable inmate and a likely target for attack because Defendants knew from OCDC records that King was on the sex offender registry and knew from OCDC records that King had a history of mental health issues and limited cognitive capacity. (Am. Compl. ¶ 136, 138, 139.)

Plaintiff further alleges that there were other prisoners housed in the B pod who Defendants knew were violent, including Tyler Grantz, who was facing multiple violent

2

charges including attempted murder and whose booking report stated, "Jail Alerts: Violent," and other prisoners who had been moved to B pod as a result of violent incidents or making threats in other areas of OCDC. (Am. Compl. ¶ 130.) Plaintiff alleges that one such prisoner, Stephen McCrimmon, was also reported as "Jail Alerts: Violent," but was given rewards and gifts by OCDC detention officers in exchange for "keep[ing] this pod running smooth." (Am. Compl. ¶¶ 130, 131.) Plaintiff alleges that McCrimmon was moved to the B pod after assaulting an inmate charged with sex offenses in the J pod, but Defendants intentionally did not include the assault in McCrimmon's booking report and did not increase supervision upon moving him to the B pod. (Am. Compl. ¶¶ 132-33.) Plaintiff alleges that McCrimmon is a frequent prisoner at OCDC and "controls" other prisoners. (Am. Compl. ¶ 135.) Plaintiff alleges that Defendants knew that prisoners including McCrimmon had specifically targeted and assaulted prisoners charged with sex offenses or on the sex offender registry, but nevertheless assigned those prisoners to the B pod with King. (Am. Compl. ¶ 136.)

Plaintiff alleges that the B pod had two floors of eleven individual cells each, behind a common area which was in view of the OCDC control room. (Am. Compl. ¶ 109.) Security cameras provided a view of the common area, stairs, and walkway to the doors of the individual cells; no cameras were placed inside the individual cells. (Am. Compl. ¶ 111.) Each cell had an intercom that allowed detention officers in the control room to speak to prisoners in each cell and to listen to any sounds inside the cell. (Am. Compl. ¶ 112.) Plaintiff alleges that detention officers could view prisoners in the common area and on the walkway both through the control room windows and on the control room monitors. (Am. Compl. ¶ 113.)

3

Plaintiff alleges that Defendants allowed prisoners to gather unsupervised in individual cells and to cover cell windows, in violation of North Carolina law requiring detention officers to continuously supervise prisoners. (Am. Compl. ¶¶ 97, 124-25, 189.) Plaintiff notes that in the B pod, cell doors were opaque and had a small window which should not have been allowed to be covered, but Plaintiff alleges that Defendants routinely allowed the windows to be covered. (Am. Compl. ¶¶ 109, 115-16, 97.) Plaintiff alleges that on March 4, 2020, cell door windows in the B pod, including King's cell door window, were entirely or partially covered by towels. (Am. Compl. ¶ 126.)

Plaintiff also alleges that Defendants failed to observe each prisoner when conducting rounds, and would instead touch their badges to sensors to falsely indicate that they had accounted for each individual prisoner. (Am. Compl. ¶¶ 98, 190.) Plaintiff notes that the Orange County Jail Policy and Procedure Manual states that detention officers are required to conduct supervision rounds at least twice per half hour, during which they must visually inspect prisoners and check for signs of "unusual or suspicious behavior." (Am. Compl. ¶¶ 119, 121.) However, Plaintiff alleges that by custom and practice, detention officers routinely conducted rounds only twice per hour and failed to conduct the required visual inspections. (Am. Compl. ¶ 120.) Plaintiff also alleges that Defendants routinely failed to address emergency medical needs of assaulted prisoners, including declining to respond immediately and with urgency to assaults and declining to secure emergency care from a licensed physician. (Am. Compl. ¶ 100.)

Plaintiff alleges that the following events occurred on March 4, 2020, and were apparent both from the control room and on display monitors inside the control room. (Am.

4

Compl. ¶ 140.) Plaintiff alleges that at 6:38 p.m., King and Inmate Grantz spoke with each other in the common area near three other prisoners, including Inmate McCrimmon and Inmate Stephens. (Am. Compl. ¶ 140(a).) King motioned Inmate Grantz to follow him, and Inmate Grantz and King entered King's cell at 6:39 p.m. (Am. Compl. ¶ 140(b-c).) Plaintiff alleges that when Inmate Grantz and King went into the cell, Inmate Stephens quickly approached King's cell and then visibly restrained someone who was attempting to exit the cell, pushing him back into the cell. (Am. Compl. ¶ 140(e, g).) Plaintiff alleges that at this time, Inmate McCrimmon, who was in the common area, said something to another prisoner and turned to watch King's cell. (Am. Compl. ¶ 140(f).) The prisoner with whom Inmate McCrimmon had spoken walked up the stairs, and after the skirmish at the cell door, joined Inmate Stephens and another prisoner, entered King's cell, and closed the door. At this point, King, Inmate Grantz, Inmate Stephens, and two other prisoners were inside King's cell. (Am. Compl. ¶ 140(f-h).) Plaintiff alleges that at 6:40 p.m., Inmate Stephens and two other prisoners exited King's cell and closed the door with King and Inmate Grantz inside. (Am. Compl. ¶ 140(i).) For the next five minutes, Inmate Stephens then held King's cell door shut with his foot while looking inside through the uncovered portion of King's cell door window as the two other prisoners stood beside him, and with King and Inmate Grantz still inside. (Am. Compl. ¶ 140(i-j).) Plaintiff alleges that at 6:45 p.m., the prisoners standing outside King's cell opened the door and Inmate Grantz exited King's cell alone and walked into his cell, which was also on the second floor, while wiping his face. (Am. Compl. ¶ 140(k).) After Inmate Grantz exited, one of the prisoners standing outside King's cell closed the door to King's cell with King still inside. (Am. Compl. ¶ 140(l).) Inmate Stephens then spoke to Inmate Grantz.

5

(Am. Compl. ¶ 140(m)).   Inmate McCrimmon walked upstairs and spoke to Inmate Stephens, who then spoke again to Inmate Grantz.  (Am. Compl. ¶ 140(m-n).)

Plaintiff alleges that Defendant Berry entered the B pod at 6:47 p.m.  At that time, the prisoners who were standing outside King's cell re-entered and exited King's cell and closed the door to King's cell, and then again re-entered King's cell while Defendant Berry was still in the B pod.  (Am. Compl. ¶ 140(q-t).)  Plaintiff alleges that Defendant Berry walked by King's cell twice without looking inside, the first time Inmate Stephens "pointed" Defendant Berry away from King's cell and the second time Defendant Berry was talking with Inmate Stephens.  (Am. Compl. ¶ 140(s-u).)   Defendant Berry exited the B pod at 6:50 p.m.  (Am. Compl. ¶ 140(w).)  Plaintiff alleges that between 6:52 p.m. and 6:59 p.m., after Defendant Berry had left, one prisoner repeatedly opened and closed the door to King's cell and exited and re-entered King's cell twice.  When the prisoner exited King's cell at 6:54 p.m., he handed something to Inmate Stephens that Inmate Stephens thew on the floor.  (Am. Compl. ¶ 140(x-bb).)

Plaintiff alleges that at 7:19 p.m. Defendant Linster entered the B pod.  (Am. Compl. ¶ 140(cc).)  Defendant Linster spoke with Inmate Stephens while standing in front of King's cell.  Defendant Linster then spoke with another prisoner who walked between Defendant Linster and King's cell.  Plaintiff alleges that Defendant Linster walked past King's cell twice without looking inside, that Defendant Linster touched his badge to the far upstairs wall sensor and both downstairs wall sensors indicating that he had conducted rounds, and that he then exited the B pod at 7:21 p.m. without having looked inside any cells.  (Am. Compl. ¶ 140(dd-gg).)  Plaintiff alleges that 7:47 p.m., Defendant Linster re-entered the B pod, touched his

6

badge to both downstairs wall sensors and went upstairs, walked past King's cell without looking into the cell, touched his badge to the far wall sensor indicating he had conducted rounds, and then walked back by King's cell again without looking into the cell, and exited the B pod at 7:49 p.m. (Am. Compl. ¶ 140(hh-kk).) Plaintiff alleges that the Sheriff's Office later reported that Defendant Linster heard a "concerning noise" coming from King's cell at 7:50 p.m.. (Am. Compl. ¶¶ 140(kk), 143.)

Plaintiff alleges that at 8:12 p.m., Defendant Berry entered the B pod with an inhaler and entered King's cell at 8:13 p.m. (Am. Compl. ¶¶ 142, 146.) Plaintiff further alleges that Defendant Berry found King "lying down, minimally responsive, soaking wet, with visible swelling and bleeding from his left eye," and blood was visible on the cell's walls and floor. (Am. Compl. ¶¶ 146-47.) Plaintiff alleges that at 8:17 p.m., Defendant Berry exited King's cell, walked around the area and touched his badge to both upstairs and both downstairs wall sensors to indicate he had conducted rounds, and exited the B pod. (Am. Compl. ¶¶ 148-49.) Plaintiff alleges that at 8:27 p.m., Defendant Berry returned and entered King's cell with Defendant Linster, that Defendant Gomez entered at 8:28 p.m., and that all three Defendants were wearing latex gloves. (Am. Compl. ¶¶ 157-58.) Plaintiff alleges that between 8:30 p.m. and 8:45 p.m., Defendants Berry and Gomez separately left and re-entered King's cell. (Am. Compl. ¶¶ 160-63.) Plaintiff also alleges that during this time Defendants Berry, Linster, and Gomez did not secure emergency medical care. (Am. Compl. ¶¶ 155, 159.) Plaintiff alleges that at 8:52 p.m., Defendants Berry and Linster exited King's cell with King, and held King up as Defendant Gomez shackled King's legs. (Am. Compl. ¶ 164.) Defendants Berry, Linster, and Gomez then carried King down the stairs after employing the help of Inmate

Stephens. (Am. Compl. ¶ 166.) Plaintiff alleges that Defendants placed King in a wheelchair at 8:56 p.m. and took him to the jail nurse's office. (Am. Compl. ¶ 167.) Plaintiff alleges that the jail nurse called 911 at 9:06 p.m., "two and a half hours after" King was assaulted and "nearly an hour after Defendant detention officers discovered him lying in his cell seriously injured and unable to walk." (Am. Compl. ¶ 168.) The jail nurse reported to 911 that King was having difficulties breathing, was not responding appropriately, and had a bruise over his eye. (Am. Compl. ¶ 168.)

Plaintiff alleges that when emergency medical personnel arrived at 9:13 p.m., Defendants "wrongly" told them that King was last seen around 7:00 p.m. on his way to take a shower. (Am. Compl. ¶¶ 169, 171.) Emergency medical personnel noted that King was soaking wet and had a hematoma over his left eye with swelling and bruising to both the upper and lower eyelids and visible blood on the eye itself, and that King was complaining of chest pain. (Am. Compl. ¶ 172.) Plaintiff alleges that King told medical personnel on the way to the hospital that "Grant" had assaulted him. (Am. Compl. ¶ 173.) King was having a major heart attack upon arrival at Duke Emergency Department at 9:42 p.m. (Am. Compl. ¶ 175.) The hospital staff noted "obvious trauma" to King's head and noted "very high concern" for Traumatic Brain Injury. (Am. Compl. ¶ 175, 41 n.2.) Shortly after arriving at Duke Emergency Department, King went into cardiac arrest and was pronounced dead at 10:22 p.m. (Am. Compl. ¶ 177.)

Plaintiff alleges that an autopsy performed on March 5, 2020, determined the cause of death was "hypertensive cardiovascular disease in the setting of a physical altercation," classified as a homicide. (Am. Compl. ¶¶ 182, 186-87.) The autopsy found "swelling and deep

8

scalp hemorrhage of Mr. King's right forehead; laceration, contusion and swelling of the right side of Mr. King's face; swelling, abrasion, and petechial hemorrhage of Mr. King's left eyelid; and hemorrhage of Mr. King's left eye." (Am. Compl. ¶ 183.) Plaintiff alleges that Defendants misrepresented to the medical examiner that there was a physical altercation between King and one other prisoner, misrepresented the time of the assault, falsely represented that other prisoners had gone into King's cell "to check on" him, misrepresented the length of time between the assault and hearing sounds from King's cell, and misrepresented King's condition when Defendants found him. (Am. Compl. ¶ 185.) Plaintiff alleges that the North Carolina Department of Health and Human Services investigated the OCDC after King's death and found that detention officers on March 4, 2020, from 5 p.m. to 12 a.m., conducted rounds improperly, without looking into individual cells, in violation of the North Carolina Administrative Code. (Am. Compl. ¶¶ 188-97.) Plaintiff further alleges that despite Defendant Sheriff Blackwood's response that "[d]isciplinary action will be taken," no detention officers involved had been disciplined as of the time the Amended Complaint was filed. (Am. Compl. ¶¶ 200-01.)

Plaintiff alleges that the policies and practices at the OCDC reflected deliberate indifference to safety and medical needs of prisoners, resulting in King's assault and death. Specifically, Plaintiff alleges that Defendants routinely failed to protect vulnerable prisoners, especially people charged with sex offenses, from assault by prisoners known to be violent, housed violent prisoners together with vulnerable prisoners and allowed them to gather unsupervised, discouraged the filing of complaints of assault, declined to record assaults in assaulting prisoners' files or discipline such prisoners, moved such prisoners to different jail

9

locations without revealing assaultive history or increasing supervision, failed to intervene during assaults, allowed the prisoners to govern themselves, encouraged known violent prisoners to run the pods, and declined to supervise or check on prisoners during rounds, instead falsely indicating the completion of rounds. (Am. Compl. ¶¶ 96, 97, 98, 99.) In addition, Plaintiffs alleges that Defendants routinely declined to address the emergency medical needs of prisoners by declining to respond after assaults, declining to treat medical emergencies with urgency after assaults, and declining to secure emergency medical care after assaults. (Am. Compl. ¶ 100.)

In the Amended Complaint, Plaintiff alleges four counts. First, Plaintiff asserts a claim under 42 U.S.C. § 1983 against Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear, and Hawkins in their individual capacities. Each of these defendants is identified as an officer who was on duty at the OCDC at the time King was assaulted and died. This count alleges that these defendants were deliberately indifferent "to Mr. King's safety from assault by other prisoners and to his serious medical needs in violation of the Eighth Amendment." (Am. Compl. at 47.) Second, Plaintiff asserts a municipal liability claim under 42 U.S.C. § 1983 against Defendant Orange County and against Defendant Sheriff Blackwood in his official capacity, and against Defendants Sykes, Hawkins, Spear, Cartnail, Moore, Berry, Linster, Gomez, and Hooker in their individual capacities, alleging "a policy or custom of deliberate indifference to the safety of prisoners from assault and to the serious medical needs of prisoners" in violation of the Eighth Amendment. (Am. Compl. at ¶ 53.) Third, Plaintiff asserts a state law wrongful death claim under North Carolina General Statute § 28A-18-2, against Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear, and Hawkins.

(Am. Compl. at 58.) Fourth, Plaintiff asserts a count on the official bond under North Carolina General Statute § 58-76-5 against Defendants Sheriff Blackwood and Travelers Casualty and Surety Company of America ("Travelers") as the surety on Sheriff Blackwood's official bond of $25,000, which was in effect on March 4, 2020. (Am. Compl. ¶¶ 59-63.)

Defendants have moved to dismiss all claims against them for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants Sheriff Blackwood, Orange County, and Travelers filed a Joint Motion to Dismiss [Doc. #33], Defendants Berry, Linster, and Gomez filed a separate Motion to Dismiss [Doc. #35], and Defendants Hooker, Moore, Cartnail, Spear, Hawkins, and Sykes filed their own Motion to Dismiss [Doc. #37]. In each of the Motions to Dismiss, Defendants contend that Plaintiff failed to state a claim upon which relief can be granted as to the named defendants, that Plaintiff failed to plausibly allege underlying unconstitutional conduct on behalf of any individual defendant, and further that Defendants are entitled to immunity.

## II.   LEGAL STANDARD

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that Plaintiff has failed to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 500 U.S. 544, 570 (2007)). This standard does not require "detailed factual allegations," but it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. A claim is facially plausible when the plaintiff provides enough factual content to enable the court to reasonably infer that the

11

defendant is liable for the misconduct alleged. Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In this way, Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 680.

In considering Defendants' motions, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." King v. Rubenstein, 825 F.3d 206, 212 (4th Cir. 2016) (stating standard). Thus, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. Notably, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely," Twombly, 550 U.S. at 556 (quotations omitted), and when "a Rule 12(b)(6) motion is testing the sufficiency of a civil rights complaint, we must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir.1999) (quotations omitted); Hall v. Burney, 454 F. App'x 149 (4th Cir. 2011); Rios v. Veale, 648 F. App'x 369 (4th Cir. 2016).

III.    DISCUSSION

A.    Count 1: Deliberate Indifference to Safety and Serious Medical Needs

In Count 1, Plaintiff asserts a claim under 42 U.S.C. § 1983 against Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear, and Hawkins, the individual officers on duty on March 4, 2020, alleging deliberate indifference to King's safety and serious medical needs, in violation of the Eighth Amendment.  (Am. Compl. at ¶ 47.)  In order to state a claim under 42 U.S.C. § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  Under the Eighth Amendment, prison officials must provide humane conditions of confinement.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Therefore, prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates" and to provide inmates with adequate medical care.  Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-527 (1984)).

To state a claim for failure to prevent harm in violation of the Eighth Amendment, a plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm," and that prison official exhibited "deliberate indifference" to that risk.  Farmer, 511 U.S. at 834.  Specifically with regard to a failure to protect from violence by other prisoners, the Supreme Court has held that:

> prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside

aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious . . . . For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety.

Farmer, 511 U.S. at 833-34 (quotations and citations omitted). "[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition . . . or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (quotations omitted). Such deliberate indifference is present when "the official knows of and disregards an excessive risk to inmate health or safety," and "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 837, 842. In addition, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.

For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the

14

circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Id. at 842-43. Deliberate indifference can also be found if the official "declined to confirm inferences of risk that he strongly suspected to exist." Id. at 843 n.8. Further, a harmed inmate need not have given "advance warning" of a risk to his safety, and the risk may have been applicable to "all prisoners in his situation" rather than for "reasons personal to him." Makdessi v. Fields, 789 F.3d 126, 134 (4th Cir. 2015) (citing Farmer, 511 U.S. at 848-49, 843) (vacating dismissal where an "undisputedly vulnerable" inmate faced substantial risk due to an "undisputedly aggressive" cellmate, and noting that "the subjective 'actual knowledge' standard required to find deliberate indifference may be proven by circumstantial evidence that a risk was so obvious that it had to have been known").

Similarly, to state a claim for deliberate indifference to medical needs in violation of the Eighth Amendment, a plaintiff must show that a defendant exhibited "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).

To state a claim under Section 1983 for deliberate indifference to serious medical needs, a prisoner must show that he had a serious medical need, and that officials knowingly disregarded that need and the substantial risk it posed. A "serious medical need" is a condition "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." An official acts with deliberate indifference if he had actual knowledge of the prisoner's serious medical needs and the related risks, but nevertheless disregarded them.

DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) (citations omitted; quoting Heyer v. United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017)); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). "[A]n inadvertent failure to provide adequate medical care" is not

enough. Estelle, 429 U.S. at 105. To establish deliberate indifference, a plaintiff must show "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction. A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto v. Stansberry, 841 F.3d 219, 226 (4th Cir. 2016) (citations and quotations omitted). In addition, "failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs." Id. (quotations omitted).

Further, for § 1983 claims asserted again individual officers, qualified immunity shields government officials from liability unless "the official violated a statutory or constitutional right" and "the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. Al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). A plaintiff bears the burden of proving a violation of the constitutional right, while a defendant bears the burden of proving that the violated right was not clearly established. Stanton v. Elliott, 25 F.4th 227, 233 & n.5 (4th Cir. 2022) (citing Henry v. Purnell, 501 F.3d 374, 377-78 & n.4 (4th Cir. 2007)). A right is clearly established when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft, 563 U.S. at 741 (quotations omitted). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Id. at 743.

However, if an Eighth Amendment violation based on deliberate indifference is plausibly alleged, then qualified immunity does not apply at the motion-to-dismiss stage. Thorpe v. Clarke, 37 F.4th 926, 934 (4th Cir. 2022) ("Because Plaintiffs have adequately pleaded Defendants' deliberate indifference, the district court correctly denied qualified immunity at the motion-to-dismiss stage."). "Because there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of the prisoners, the immunity's cloak will not embrace them." Id. (citations and quotations omitted). Thus, if a plaintiff has made a showing sufficient to demonstrate an Eighth Amendment violation involving deliberate indifference to inmate health or safety, that is "also . . . sufficient to overcome any claim to qualified immunity." Id. (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001)). Dismissal is then "improper so long as the officers' mental state remains genuinely in issue." Id.; see also Nellon v. Hampton, No. 1:15CV592, 2016 WL 6426382, at *5 (M.D.N.C. Oct. 31, 2016), report and rec. adopted, 2016 WL 11373412 (M.D.N.C. Dec. 12, 2016).

In the present Motions to Dismiss, Defendants contend that Plaintiff has not plausibly alleged an Eighth Amendment violation, and further that Defendants are entitled to qualified immunity. In considering these contentions, and viewing the allegations in the light most favorable to Plaintiff, the Court notes first that Plaintiff has plausibly alleged that King faced a substantial risk of serious harm during his incarceration, resulting in the physical assault that occurred in his cell at the OCDC on March 4, 2020, and that Defendants were aware of that risk due to several known factors, including a history at the OCDC of violent prisoners assaulting other prisoners who are on the sex offender registry, King's status as a registered

17

sex offender, King's mental health and cognitive limitations, and known violent prisoners being housed in the B Pod with King, including Inmate McCrimmon. Specifically, as to Inmate McCrimmon, Plaintiff alleges Defendants knew McCrimmon had recently assaulted an individual on the sex offender registry, but Defendants deliberately concealed the assault when McCrimmon was moved to the B pod, and instead gave McCrimmon rewards in exchange for McCrimmon keeping the pod "running smooth." (Am. Compl. ¶¶ 131, 133, 136, 139.) Plaintiff alleges that the Defendants essentially allowed and encouraged McCrimmon and other violent inmates to enforce their own rules with violence while Defendants rewarded them, covered up for them, and declined to intervene, resulting in those violent prisoners attacking King. Plaintiff further alleges that Defendants intentionally disregarded the substantial risk of serious harm by routinely allowing prisoners to gather in cells without supervision, by allowing prisoners to cover cell windows, by not investigating suspicious prisoner behavior and altercations, and by routinely conducting inadequate rounds in which Defendants failed to account for each individual prisoner but touched their badges to sensors to falsely indicate that they had done so. (Am. Compl. ¶¶ 97-98.)

Further, as to Defendants Barry and Linster, Plaintiff alleges that Defendants Berry and Linster conducted rounds after King was attacked but did not look into King's cell or address the suspicious behavior of other prisoners, and instead touched their badges to sensors to falsely indicate that they had accounted for each prisoner. In addition, with regard to all of the on-duty Defendants, including Defendants Barry and Linster and also Defendants Gomez, Hooker, Moore, Cartnail, Spear, and Hawkins, Plaintiff alleges that the described events from March 4, 2020, were apparent both from the control room and on display monitors inside the

18

control room, and that the described events all occurred "in view of detention officers and their supervisors" through the control room windows and on the monitors. (Am. Compl. ¶¶ 1, 7, 8, 12, 140, 141, 198.) Drawing all reasonable inferences in Plaintiff's favor, Plaintiff alleges that the on-duty Defendants observed and allowed multiple inmates known to be violent and with a known history of assaulting sex offenders to isolate King in his cell, physically restrain him from leaving, and cover the windows and guard the door during the assault, with violent inmates going in and out but no guards investigating for over an hour, instead deferring to the violent inmates as part of a tacit agreement in which those prisoners were allowed and encouraged to enforce their own rules with violence. (Am. Compl. ¶¶ 140(q-w, cc-ii.), 198.)[1] Taking Plaintiff's allegations as true, Plaintiff has plausibly alleged that Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear, and Hawkins exhibited deliberate indifference to the substantial risk of harm to Mr. King in violation of the Eighth Amendment.

---

[1] Defendants point to a decision on the Eastern District of North Carolina discussing the extent to which a prisoner's own actions could undermine the prisoner's allegations of fear for safety or a claim that defendants exhibited deliberate indifference to a known risk of harm. (Def. Br. [Doc. #36] at 16-17 (citing Delgado v. Solomon, No. 5:16-CT-3163-FL, 2020 WL 1528518, at *5 (E.D.N.C. Mar. 30, 2020).) However, that case involved a determination at summary judgment after discovery, rather than consideration based solely on allegations in the complaint. Here, Plaintiff has alleged that Defendants knew of McCrimmon's history and of the warnings of violence as to other prisoners including Gantz, as well as King's history including his status on the sex offender registry and low cognitive function, and any further weighing of the evidence is beyond the scope of the present motion to dismiss. Defendants also point to the decision of the Fourth Circuit in Ervin v. Mangum, finding that the connection between the prison conditions and the prisoner's assault were too attenuated to support a claim of deliberate indifference. (Def. Br. [Doc. #36] at 16-17 (citing Ervin v. Mangum, No. 93-7129, 1997 WL 664606, at *5 (4th Cir. Oct. 27, 1997).) Again, however, that case was resolved at summary judgment, and here Plaintiff alleges that King was a known vulnerable prisoner and was assaulted by specific prisoners who were known to have a violent history of assaulting other prisoners and who were specifically allowed and encouraged to run the pod and then given the opportunity for the assault without investigation or oversight by officers in view of the windows and monitors. Defendants of course dispute this contention, but that is a matter beyond the scope of the present motion to dismiss.

In addition, with respect to the alleged deliberate indifference to King's serious medical needs, Plaintiff has plausibly alleged that after the assault which resulted in his eventual death, King's medical needs were serious. Plaintiff alleges that Defendant Berry found King "lying down, minimally responsive, soaking wet, with visible swelling and bleeding from his left eye" with visible blood on the walls and floor in his cell. (Am. Compl. ¶¶ 146-47.) Later descriptions reflect that King was having difficulties breathing, was not responding appropriately, and had a bruise over his eye (Am. Compl. ¶ 168), that he was soaking wet and had a hematoma over his left eye with swelling and bruising to both the upper and lower eyelids and visible blood on the eye itself (Am. Compl. ¶ 172), and that there was "obvious trauma" to King's head and "a very high concern" for Traumatic Brain Injury. (Am. Compl. ¶ 175, 41 n.2.) These allegations taken together indicate that King's medical needs were both obvious and serious.

In addition, Plaintiff has plausibly alleged that Defendant Berry knew of King's serious medical needs when Defendant Berry finally entered the cell and saw King after the assault. (Am. Compl. ¶ 146.) Plaintiff alleges that Defendant Berry left King's cell four minutes after finding him, but then walked around and touched his badge to the sensors to finish rounds, then returned ten minutes later with Defendants Linster and Gomez, and brought King out of the cell twenty-five minutes later, having not secured emergency medical care for King during the preceding forty-three minutes. (Am. Compl. ¶¶ 142, 146-48, 155, 157-64.) Construing the inferences in Plaintiff's favor, the length of time that allegedly passed after Defendant Berry first encountered King without Defendant Berry securing medical care leads to a reasonable inference that Defendant Berry disregarded King's serious medical needs.

Similarly, Defendant Linster is alleged to have heard concerning noises from King's cell at 7:50 p.m., but did not enter King's cell for over thirty minutes, and then entered King's cell and observed his condition at 8:27 p.m. but did not emerge until twenty-five minutes later, without seeking emergency medical care for King during any of that period. (Am. Compl. ¶¶ 157, 159, 164.) As to Defendant Gomez, Plaintiff similarly alleges that Defendant Gomez entered King's cell at 8:28 p.m. and was therefore aware of his serious medical needs, but did not bring King out of the cell until twenty-four minutes later, likewise failing to seek emergency medical care for King during that time. (Am. Compl. ¶¶ 157-64.) Further, Plaintiff alleges that Defendants Berry, Linster, and Gomez all spent several minutes shackling King's legs and attempting to then carry him with shackled legs, despite his acute medical emergency, further delaying any medical care. Ultimately, emergency medical services were not called until over an hour after Defendant Lister heard the concerning noises and over 50 minutes after Defendant Berry first observed King minimally responsive with blood in his cell and bruises and bleeding on his head and eye.[2] Taking the inferences in Plaintiff's favor, these allegations

---

[2] The Court notes that Defendants set out a timeframe that differs from Plaintiff's, particularly with respect to the time between when Defendant Berry observed King in need of medical care and when Defendants Berry, Linster, and Gomez removed King from his cell to receive medical care. (Compare Am. Compl. ¶¶ 142-164 with Def. Br. [Doc. #34] at 3; Def. Br. [Doc. #36] at 2; Def. Br. [Doc. #38] at 2.) Specifically, Defendants assert that within 15 minutes of when Defendant Berry observed King's injuries, Defendants Berry, Linster, and Gomez "went to Mr. King's cell and carried Mr. King out of his cell, placed him in a wheelchair, and took him to the nurse's office." Defendants also imply that the initial response was at the direction of the jail nurse. These contentions are in contrast to Plaintiff's version of events recounted above. At the motion-to-dismiss stage of the proceedings, the Court may not make credibility and other factual determinations. Ultimately, after discovery, and on dispositive motions, the Court can consider Defendants' assertions and the evidence presented to determine whether Plaintiff is able to present sufficient evidence in support of the claims.

and the length of time that allegedly passed leads to a reasonable inference that Defendants Berry, Lister, and Gomez deliberately disregarded King's serious medical needs. [3]

As to all of the claims asserted in Count 1, to the extent Defendants assert qualified immunity, because Plaintiff has plausibly alleged an Eighth Amendment claim based on deliberate indifference, qualified immunity does not provide a separate basis for dismissal at the motion to dismiss stage. See Thorpe v. Clarke, 37 F.4th 926, 934 (4th Cir. 2022) ("Because Plaintiffs have adequately pleaded Defendants' deliberate indifference, the district court correctly denied qualified immunity at the motion-to-dismiss stage."). As discussed above, "there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of the prisoners." Id. (internal citations and quotations omitted). Indeed, qualified immunity is designed to protect officials who make determinations where the law is unclear; here Plaintiff has alleged intentional, deliberate conduct in violation of the Eighth Amendment, which is "also . . . sufficient to overcome any claim to qualified immunity." Id. (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001)).[4]

Therefore, the Court recommends that the Motion to Dismiss as to Count 1 be denied.

---

[3] As to the other on-duty Defendants (Defendants Hooker, Moore, Cartnail, Spear, and Hawkins), Plaintiff has not alleged how these Defendants were aware of King's serious medical needs or how they disregarded those needs. Thus, it appears that Plaintiff asserts Count 1 against these other on-duty Defendants primarily as to their deliberate indifference to the substantial risk of serious harm to King, discussed above. Therefore, the Court construes the parts of Count 1 alleging deliberate indifference to King's serious medical needs as directed to Defendants Berry, Listner, and Gomez. To the extent there may be further issues on that point, those issues can be addressed at summary judgment.

[4] Plaintiff also alleges that Defendants misrepresented and concealed various facts, from concealing McCrimmon's history of assault to misrepresenting to emergency personnel and the medical examiner the timeline and circumstances of the assault on King, which could reasonably be inferred as intentional efforts by Defendants to conceal their known wrongdoing.

B.  Count 2: Policy or Custom of Deliberate Indifference

Under § 1983, municipal liability is limited to action for which the municipality is "actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). Municipal liability under § 1983 applies to local government entities, including local government officials sued in their official capacity, when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Social Services, 436 U.S. 658, 690 & n.55 (1978). A local government entity is not liable under § 1983 "*solely* because it employs a tortfeasor." Id. at 691.

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifests deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). Cf. Kopf v. Wing, 942 F.2d 265, 269 (4th Cir. 1991) ("Of course, written policies are carefully crafted to be constitutional, and a plaintiff must usually prove the existence of some unpublished practice."). "Municipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987). A policymaker's constructive knowledge of a custom "may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest

Case 1:21-cv-00383-CCE-JEP   Document 50   Filed 06/23/23   Page 23 of 33

opportunities and official duty of responsible policymakers to be informed, or combinations of these." Id. A particular constitutional violation is caused by a custom when "occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Id.

Municipal liability applies to an entity only for a policy "for which [the entity] has final 'policymaking' authority," and the determination of such authority is "an inquiry governed by state law." Lewis v. Peterkin, No. 1:19CV418, 2020 WL 5700755, at *2 (M.D.N.C. Sept. 24, 2020) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)); see also Hunter v. Town of Mocksville, 897 F.3d 538, 555 (4th Cir. 2018). North Carolina law provides that county sheriffs are elected directly by voters and have the "exclusive right to . . . supervise the employees in [the sheriff's] office". N.C. Gen. Stat. Ann. §§ 162-1, 153A-103 (West 2023). Furthermore, North Carolina law assigns "care and custody of the [county] jail" to the county sheriff. Id. § 162-22. Therefore, "any allegations relating to personnel, training, or other law enforcement policies at the county jail fall within the sheriff's policymaking authority and are not attributable to the county." Jones v. Harrison, No. 4:12-CV-90-D, 2013 WL 1452861, at *2 (E.D.N.C. Apr. 9, 2013). However, the county is responsible for developing a "plan for providing medical care for prisoners" in the county jail, together with the sheriff and other local authorities. N.C. Gen. Stat. Ann. § 153A-225 (West 2023). Therefore, counties in North Carolina may be held liable under § 1983 for inadequate medical care plans. See Jones, 2013 WL 1452861, at *2-3. In addition, if the county delegates its authority to establish final policy to the Sheriff, "the Sheriff's decisions would represent county policy and could give rise to

municipal liability." <u>Hunter</u>, 897 F.3d at 555 (quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 n.12 (opinion of Brennan J., joined by White, Marshall, & Blackmun, JJ.)).

In this case, Plaintiff has plausibly alleged practices of deliberate indifference to safety and serious medical needs that are sufficiently persistent and widespread to constitute a custom under § 1983. Plaintiff alleges that detention officers at OCDC routinely housed known violent prisoners together with known vulnerable prisoners, including sex offenders, without adequate supervision; allowed prisoners to gather unsupervised in cells and cover cell windows; regularly conducted rounds without visually inspecting prisoners; and routinely declined to respond with urgency to assaults on prisoners or to secure emergency medical care. (Am. Compl. ¶¶ 96-100.) Plaintiff further alleges that as part of these practices, prisoners were allowed and encouraged to run the pods, including with violence, and assaults were concealed when moving prisoners to a new pod. Furthermore, these practices are plausibly alleged to have been persistent and widespread, as Plaintiff claims that these practices happened routinely, that Defendant Sykes stated that unsupervised gatherings of prisoners were "not uncommon," and that Defendant Sheriff Blackwood has not disciplined any officers involved in the events of March 4, 2020. (Am. Compl. ¶¶ 123, 201.) It is reasonable to infer from these allegations, taken as true at this stage, that the alleged practices were common at the OCDC to the point of being expected behavior for detention officers. Further, Plaintiff alleges that the Sheriff knew the risks to inmate safety, which is why, for example, formal policies required visual inspection of all inmates twice per half hour. Plaintiff alleges, however, that the Sheriff nevertheless allowed the detention officers to disregard the minimum standards of supervision, and allowed the widespread practices alleged above, including failing to observe

25

individual prisoners during rounds, allowing inmates to gather in cells and cover cell windows, allowing prisoners to run the pods, routinely declining to respond with urgency to assaults on prisoners or to secure emergency medical care, and failing to protect vulnerable prisoners from assaults by prisoners known to be violent by housing them together without adequate supervision and failing to intervene during assaults or discipline prisoners who assaulted other prisoners. Therefore, Plaintiff has plausibly alleged the existence of a custom of deliberate indifference to safety and serious medical needs under § 1983. Plaintiff alleges that Defendant Sheriff Blackwood knew of these practices and allowed them to continue, and Defendant Sheriff Blackwood is the final policymaker regarding his employees' actions under North Carolina law. (Am. Compl. ¶¶ 52-56, 227.) Plaintiff further alleges that these policies and customs caused King's death. Specifically, Plaintiff alleges that on March 4, 2020, King's cell window was partially covered, known violent prisoners (including those with a history of targeting and assaulting sex offenders) were housed with King and were allowed to enter King's cell, King was a known vulnerable prisoner, no officers conducting rounds looked inside King's cell, officers deferred to the prisoners who had been allowed and encouraged to run the pod, officers failed to intervene even after viewing violent prisoners apparently preventing King from leaving and blocking his door, and officers failed to respond with urgency to King's serious medical needs once discovered. (Am. Compl. ¶¶ 126, 130, 138-40.) These allegations are examples of the alleged custom and practice in action, and taken as true, would lead to a reasonable inference of a sufficiently close causal connection, that is, that the attack on King and his eventual death were made reasonably probable by the permitted

continuation of the alleged custom and practice.[5]  Therefore, the Court recommends that Defendants' motion to dismiss as to Plaintiff's <u>Monell</u> claim against Defendant Sheriff Blackwood and Orange County be denied.[6]

However, Plaintiff has also asserted a <u>Monell</u> claim against Defendants Sykes, Hawkins, Spear, Cartnail, Moore, Berry, Linster, Gomez, and Hooker for a policy or custom of deliberate indifference to safety and serious medical needs.  However, municipal liability under § 1983 applies only to local government entities, including local government officials sued in their official capacity.  Plaintiff has sued Defendants Sykes, Hawkins, Spear, Cartnail, Moore, Berry, Linster, Gomez, and Hooker in their individual capacities.  In <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985), the Supreme Court explained, "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent only another way of pleading an

---

[5] Defendants contend that the Amended Complaint alleges the existence of <u>constitutional</u> policies that would <u>require</u> visual inspection of each prisoner during rounds and would mandate observation of suspicious behavior (including prohibiting prisoners from guarding cell doors).  However, these allegations are set out in the Amended Complaint to show Defendants' knowledge of what was required to adequately supervise and address the safety of the prisoners, but the Amended Complaint further alleges that in custom and practice these policies were not followed, reflecting a policy of deliberate indifference to these safety concerns and the known and obvious consequences.  Any further analysis of the policies and the extent to which those policies were, by custom, disregarded would be for further consideration on the record after discovery.

[6] As to Orange County, as noted above, Orange County may be held liable for an inadequate medical care plan, and if the county delegates its authority to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.  Plaintiff alleges that Orange County delegated the provision of emergency medical care to a contractor, Southern Health Partners, Inc., and left Sheriff Blackwood as final policymaker for Orange County regarding supervision of prisoners to determine their emergency medical needs (Am. Compl. ¶¶ 154, 227.)  <u>See also</u> <u>Lewis</u>, 2020 WL 5700755 (concluding that the county should not be dismissed at the motion to dismiss stage, in light of the North Carolina state statutes vesting the county with policymaking authority regarding the provision of emergency medical care to county detainees); <u>Vaught v. Ingram</u>, 2011 WL 761482 (E.D.N.C. Feb. 24, 2011) (concluding that "plaintiff's claim that [the] County failed to provide medical services and emergency medical care pursuant to § 153 A–225 survives [the] County's motion to dismiss because § 153A–225(a) appears to impose statutory duties on the county for the provision of medical care and emergency medical care.").  Defendants address this issue in the Reply Brief, but given the lack of fully briefing, further analysis of this issue can be undertaken on dispositive motions after discovery.

27

action against an entity of which an officer is an agent.'" (quoting Monell, 436 U.S. at 690). A Monell claim holds the "government as an entity . . . responsible under § 1983." Monell, 436 U.S. at 694. In contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a government official[.]" Graham, 473 U.S. at 165. Therefore, "[a] victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him." Id. at 167-68. "If Monell is limited to municipal entities and personal-capacity suits concern individuals, it follows that a Monell claim cannot lie against a municipal official sued in his individual capacity." Grim v. Baltimore Police Dep't, et. al., Civil Action No. ELH-18-3864, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019); see also, e.g., Devi v. Prince George's Cty., DKC-16-3790, 2017 WL 3592452 at *2 n.3 (D. Md. Aug. 21, 2017) ("Plaintiff cannot state a Monell claim against an officer in his individual capacity."); Harasz v. Katz, 239 F. Supp. 3d 461, 505 (D. Conn. 2017) ("Monell does not apply to state officials or individuals sued in their individual capacity." (citation omitted)). Consequently, because Plaintiff sues Defendants Sykes, Hawkins, Spear, Cartnail, Moore, Berry, Linster, Gomez, and Hooker in their individual capacities, the Court recommends that Defendants' motion to dismiss Count 2 against Defendants Sykes, Hawkins, Spear, Cartnail, Moore, Berry, Linster, Gomez, and Hooker be granted. As this is the only count against Defendant Sykes, the Court recommends that Defendant Sykes be dismissed from this suit.[7]

---

[7] Defendant Sykes is named in the Amended Complaint as Chief Deputy to Sheriff Blackwood but was not on duty at the OCDC on March 4, 2023. (Am. Compl. ¶ 93.) Defendant Sykes is sued only in his individual capacity and is only named in Count 2. Cf. Acquah v. J.B. v. City of Syracuse, No. 5:18-CV-1378, 2020 WL 1510405 (N.D.N.Y Mar. 30, 2020) (dismissing Monell claims against the Chief of Police in his individual capacity because "Monell does not apply to . . . individuals who are sued in their individual capacity," and declining to construe the complaint to include a claim that was not pled). Sheriff Blackwood, in his official capacity, remains as a Defendant in Count 2 for any Monell claim based on policies and customs set by him or by anyone alleged to have final policymaking authority, including Sykes.

28

C.    Count 3: State Law Wrongful Death

In Count 3, Plaintiff brings a state law wrongful death claim against the on-duty Defendants: Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear, and Hawkins, under North Carolina General Statute § 28A-18-2.   In the Motions to Dismiss, Defendants contend that Plaintiff has not plausibly alleged a wrongful death claim and that Defendants are entitled to public officer immunity.   Under North Carolina General Statute § 28A-18-2(a),

> "When the death of a person is caused by a wrongful act, neglect or default of another, such as would, if the injured person had lived, have entitled the injured person to an action for damages therefor, the person or corporation that would have been so liable, and the personal representatives or collectors of the person or corporation that would have been so liable, shall be liable to an action for damages, to be brought by the personal representative or collector of the decedent . . . "

N.C. Gen. Stat. Ann. § 28A-18-2(a) (West 2023).  To state a wrongful death claim, a plaintiff must show that the defendant failed "to exercise proper care in the performance of some legal duty which the defendant owed plaintiff's intestate" and "that such negligent breach of duty was the proximate cause of the injury which produced the death . . ." Harris v. Wright, 151 S.E.2d 563, 566 (N.C. 1966) (collecting cases).

In general, under North Carolina law, public officials "engaged in the performance of governmental duties involving the exercise of judgment and discretion" enjoy immunity from personal liability.  Meyer v. Walls, 489 S.E.2d 880, 888 (N.C. 1997) (quoting Smith v. Hefner, 68 S.E.2d 783, 787 (N.C. 1952)).  To maintain a suit against a public official in his or her individual capacity, "the plaintiff must make a *prima facie* showing that the official's actions (under color of authority) are sufficient to pierce the cloak of official immunity."  Moore v.

29

<u>Evans</u>, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996) (citing <u>Epps v. Duke University,</u> 468 S.E.2d 846 (N.C. Ct. App. 1996)). "Actions that are malicious, corrupt or outside of the scope of official duties will pierce the cloak of official immunity, thus holding the official liable for his acts like any private individual." <u>Id.</u> (citing <u>Gurganious v. Simpson</u>, 197 S.E. 163, 164 (N.C. 1938); <u>Golden Rule Ins. Co. v. Long</u>, 439 S.E.2d 599, 603 (N.C. Ct. App. 1993), <u>review denied</u>, 335 N.C. 555 (N.C. 1993)). A public official "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." <u>Grad v. Kaasa</u>, 321 S.E.2d 888, 890 (N.C. 1984).

Here, Plaintiff has plausibly alleged that Defendants Berry, Linster, Gomez failed in the performance of a legal duty when they found King with serious medical needs and were deliberately indifferent to those serious medical needs by delaying securing emergency medical care, which was the proximate cause of King's death. (Am. Compl. ¶¶ 238-39.) As discussed above, Plaintiff has provided sufficient factual allegations about Defendants Berry, Linster, and Gomez's individual acts to support this claim. In addition, as to all of the on-duty Defendants, Plaintiff has alleged that these Defendants were deliberately indifferent to the substantial risk of harm to King by assault from other inmates, leading to his death. As discussed above, Plaintiff has provided sufficient factual allegations about Defendants Berry, Linster, Gomez, Hooker, Moore, Cartnail, Spear, and Hawkins to support these claims.

These Defendants are not entitled to qualified immunity as to Plaintiff's § 1983 claim, and for similar reasons are not entitled to public official immunity as to Plaintiff's wrongful death claim at this stage in the case. "[P]ublic officers' immunity, at the least, is unavailable to

officers who violate clearly established rights because an officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty.'" Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003) (quoting Grad, 321 S.E.2d at 890). Thus, taking Plaintiff's allegation as true, and for the reasons set out at length above, Plaintiff has plausibly alleged that these Defendants acted with malice or wantonly did that which an officer of reasonable intelligence would know to be contrary to his duty. Therefore, Plaintiff has provided sufficient factual allegations to pierce the cloak of official immunity. See Bailey, 349 F.3d at 742; Smith v. City of Greensboro, No. 1:19CV386, 2020 WL 1452114, at *9 (M.D.N.C. Mar. 25, 2020), reconsideration denied, No. 1:19CV386, 2021 WL 5771544 (M.D.N.C. Dec. 6, 2021) (denying the motion to dismiss on the North Carolina wrongful death count because plaintiff plausibly alleged a constitution violation, and "public official immunity is unavailable to officers who violate clearly established rights" (quotations omitted)). Accordingly, the Court recommends that Defendants' motion to dismiss as to Plaintiff's wrongful death claim be denied at this stage.

D.    Count 4: Action on Official Bond

Under North Carolina law, although sheriffs are typically entitled to governmental immunity on state law claims, "a sheriff may . . . waive governmental immunity by purchasing a bond." Sellers v. Rodriguez, 561 S.E.2d 336, 339 (N.C. Ct. App. 2002). Under North Carolina General Statute § 58-76-5,

> Every person injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff . . . or other officer, may institute a suit or suits against said officer or any of them and their sureties upon their respective bonds for the due performance of their duties in office in the name of the State . . . every such officer and the sureties on the officer's official bond shall be liable to the person

31

injured for all acts done by said officer by virtue or under color of that officer's office.

N.C. Gen. Stat. Ann. § 58-76-5 (West 2023). To bring a claim of action on an official bond under § 58-76-5, a plaintiff must allege that the bonded officer "either intentionally engaged in misconduct and misbehavior while performing his custodial duties, or that he acted negligently in the performance of those duties, despite his duty to do otherwise." Stafford v. Barker, 502 S.E.2d 1, 6 (N.C. Ct. App. 1998). Furthermore, § 58-76-5 "suits can be maintained not just for the actions of the sheriffs themselves, but also based on the actions of their deputies while acting under color of law. Thus, the statutory bond works as a waiver of the governmental immunity of sheriffs and their deputies where . . . the surety is joined as a party." Massasoit v. Carter, 439 F. Supp. 2d 463, 485 (M.D.N.C. 2006), aff'd, 253 F. App'x 295 (4th Cir. 2007).

Here, Plaintiff brings a claim of action on official bond against Defendant Sheriff Blackwood and Travelers under North Carolina General Statute § 58-76-5. In the Motion to Dismiss, Defendants contend that this claim should be dismissed because Plaintiff has not pled a valid state law claim against any of the Defendants. (Def. Br. [Doc. #34] at 13.) However, as noted above, Plaintiff has plausibly asserted state law claims based on the allegations at this stage of the case.

In addition, Plaintiff plausibly alleges that Defendant Sheriff Blackwood procured an official bond from Travelers in the sum of $25,000 as required by North Carolina General Statute § 162-6. (Am. Compl. ¶¶ 59, 242.) Plaintiff also alleges that the Orange County deputies and detention officers were acting within the course and scope of their employment with the Orange County Sheriff's Office when they declined to protect King from assault and

declined "to timely or appropriately respond to his medical needs, causing his death." (Am. Compl. ¶ 244.) Plaintiff alleges that the acts of Defendant Sheriff Blackwood's deputies and detention officers are imputed to Defendant Sheriff Blackwood and constitute misconduct, misbehavior, and a breach of official duties. (Am. Compl. ¶¶ 244-45.) Finally, Plaintiff has added Travelers as surety in this action. Therefore, Plaintiff has stated a cause of action on official bond against Defendant Sheriff Blackwood and Defendant Travelers sufficient to survive a motion to dismiss. See Summey v. Barker, 544 S.E.2d 262, 265 (N.C. Ct. App. 2001) (affirming trial court's denial of defendant-sheriff's motion to dismiss action on official bond where plaintiff alleged defendant-sheriff was liable for negligence of jail personnel).

Accordingly, the Court recommends that Defendants' motion to dismiss as to Plaintiff's cause of action on official bond against Defendant Sheriff Blackwood and Travelers be denied.

IV. CONCLUSION

IT IS THEREFORE RECOMMENDED that the Motion to Dismiss [Doc. #33] as to Defendants Sheriff Blackwood, Orange County, and Travelers be denied; and that the Motions to Dismiss [Doc. #35, #37] as to the individual Defendants be granted in part and denied in part, specifically that they be granted to the extent that Count 2 be dismissed as to the individual Defendants, and that as a result Defendant Sykes be dismissed from the case, but otherwise denied.

This, the 23rd day of June, 2023.

/s/ Joi Elizabeth Peake
United States Magistrate Judge